**UNITED STATES of America,**
**Appellee,**

v.

**Roy B. KELLY, Cecil V. Hagen and Milton J. Shuck, Defendants-Appellants.**

No. 99, Docket 28018.

United States Court of Appeals
Second Circuit.

Argued Nov. 19, 1964.

Decided July 29, 1965.

722

Charles A. Stillman, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Robert G. Morvillo, Lawrence W. Newman and John S. Martin, Jr., Asst. U. S. Attys., and Robert M. Cipes, Sp. Asst. to U. S. Atty., New York City, on the brief), for appellee.

Albert J. Ahern, Jr., Washington, D. C. (Marvin B. Segal, New York City, on the brief), for defendant-appellant Roy B. Kelly.

Marvin B. Segal, New York City (Albert J. Ahern, Jr., Washington, D. C., on the brief), for defendant-appellant Cecil V. Hagen.

Stuart Robinowitz, New York City (Robert L. Ellis, Renee J. Roberts, Joseph Zuckerman and Rosenman, Colin, Kaye, Petschek & Freund, New York City, on the brief), for defendant-appellant Milton J. Shuck.

Before MEDINA, MOORE and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge:

This is another one of those seemingly interminable stock fraud conspiracy cases which have bedevilled this Court and judges and juries in the Southern District of New York during recent years. See also, e. g., United States v. Re, 2 Cir., 1964, 336 F.2d 306, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L. Ed.2d 177; United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523. It is a sad commentary upon the morals of our stock market places in general, and the over-the-counter market in particular, that at this late date in the history of federal securities regulation we are called upon once again to "memorialize the rapacity of the perpetrators and the gullibility, and perhaps also the cupidity, of the victims." United States v. Benjamin, 2 Cir., 1964, 328 F.2d 854, 856, cert. denied sub nom. Howard v.

United States, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497.

The indictment is a formidable document containing 160 counts, naming 20 defendants and 28 alleged co-conspirators. The following individual and corporate defendants pleaded guilty before trial: John Van Allen, Irving H. Hertzberg, F. W. MacDonald & Co., Pierre A. DuVal, DuVal's Consensus, Inc., Martin Teller and Michael Ackman. Cases against the following defendants were severed prior to trial: Paul Hagenbach, Brandel Trust, Charles R. Stahl, DePontet & Co., Adam Miles, and Stahl, Miles & Co., Ltd. The trial commenced on November 14, 1962 and the jury returned its verdict some nine months later on August 7, 1963. In the meantime, on February 7, 1963 defendant Jules Bean pleaded guilty and the case against the corporate defendant Singer, Bean & Mackie was severed. Van Allen, Hertzberg, Teller, Hagenbach and Stahl were Government witnesses at the trial.

For one reason or another most of the 160 counts of the indictment were eliminated and only seven were submitted to the jury with respect to the four remaining defendants. The jury found Roy B. Kelly, Cecil V. Hagen, Milton J. Shuck and Gulf Coast Leaseholds, Inc. guilty of conspiracy as charged in Count 1. Kelly, Hagen and Gulf Coast Leaseholds, Inc. were found guilty as charged in substantive registration counts 57, 60 and 61 and they were all acquitted on the substantive fraud count 107. Shuck was not only found guilty of conspiracy as above stated. The jury also found him guilty as charged in the substantive fraud counts 93, 105 and 107. Gulf Coast Leaseholds, Inc. was fined and has not appealed. Kelly and Hagen were sentenced on each of Counts 1, 57, 60 and 61 to three years imprisonment, to be served concurrently. Hagen was also fined $25,000. Shuck was sentenced on each of Counts 1, 93, 105 and 107 to eighteen months imprisonment, to be served concurrently, and his fine of $25,-000 was remitted, as was also the fine in the same amount originally imposed on Kelly. The three convicted individuals, Kelly, Hagen and Shuck have appealed to this Court and each is now on bail pending the disposition of the appeal.

While the eleven months trial in United States v. Dardi, supra, 2 Cir., 1964, 330 F.2d 316, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50, probably is something of a record for a criminal conspiracy case tried to court and jury, this case would seem to be a close second. The elapsed time of the trial was just short of nine months. The trial transcript covers 18,000 pages and we have before us an additional 4,000 pages of various preliminary hearings, motions, affidavits and other papers. The prosecutor informed the trial judge, just before the summations, that over 1,000 exhibits had been offered by the Government and over 500 exhibits offered by the various defendants, that 44 witnesses had been called by the Government and 18 called by appellant Shuck.

We affirm in all respects the judgment of conviction against Kelly and Hagen on Counts 1, 57, 60 and 61. We reverse the judgment of conviction against Shuck on Counts 1, 93, 105 and 107 and remand the case against him for retrial on all said Counts, if the prosecutor is so advised.

*Synopsis of Opinion*

*I*

Summary of Appellants' Law Points for Reversal

*II*

Comprehensive and Chronological Review of the Evidence

*III*

The Conspiracy Count

*IV*

The Claims of Misconduct by the Trial Judge are Wholly Unjustified

*V*

The So-Called "Slanted" Instructions

## VI

### The Reading of the Indictment to the Jury

## VII

### Accomplices and Co-conspirators Who Pleaded Guilty

## VIII

### Miscellaneous Claims of Violation of Constitutional Rights of Kelly and Hagen

## IX

### Objections to Various Documents Offered by the Prosecutor Were Properly Overruled

## X

### The Cross-examination of the Government Witness Shreve

## XI

### It Was Not Error to Send GX990 to the Jury During Its Deliberations

## XII

### The Refusal to Excuse Juror No. 3 Was Proper

## XIII

### Omnibus Discussion of Miscellaneous Other Claims of Error

## XIV

### The Substantive Counts

## XV

### The Challenge to the Method of Selecting Jurors Was Properly Overruled

## XVI

### Conclusion

## I

### *Summary of Appellants' Law Points for Reversal*

The principal legal question in the case is the familiar one concerning the Government claim of a single over-all conspiracy vis-a-vis the contention of Shuck that the case should have been severed as to him, and that, in any event, the evidence was not sufficient to connect him with any single over-all conspiracy, but rather at most with a separate and distinct conspiracy.

Other contentions include:

Alleged prejudicial error in reading the indictment to the jury as part of the instructions at the close of the evidence.

Fifty-two other separate claims by Kelly and Hagen of prejudicial error in the instructions to the jury and in refusing requests for instructions.

The challenged admissibility into evidence of Government Exhibits: 104, 434(a), 442, 446(a), 446(c), 446(d), 446(e), 446(i), 446(uu), 447(a), 447(e), 447(o), 447(s), 556, 617, 773, 862, 865, 921, 933, 937, 991.

Claims of improper restrictions on the cross-examination of the Government witnesses Shreve and Teller.

The claim by Kelly and Hagen that Juror No. 3 should have been excused.

A miscellany of points by Kelly and Hagen relating to the refusal to direct the taking of certain depositions before trial, the fixing of bail, the receipt of papers served by the Government in opposition to certain pre-trial motions, the refusal to sentence those co-defendants who had pleaded guilty before or during the trial until after the jury had rendered its verdict, the refusal of the trial court to give reasons for his rulings on the admissibility of evidence, and many other allegedly prejudicial rulings too numerous to describe in detail including, in the colorful language of counsel for Kelly, the "tenacious" refusal of the Court to furnish counsel with a copy of his charge.

A further miscellany of points relating to the conduct of the trial judge and a variety of rulings, each of which is claimed to constitute a violation of the constitutional rights of Kelly and Hagen under the Fifth and Sixth Amendments, including claims that on several occasions the trial judge lost jurisdiction by *ex parte* continuation of the trial in the absence of Kelly and Hagen and their counsel, that he refused to hear argument and thus deprived these appellants of procedural due process, that Kelly and Hagen were deprived of their right to a speedy trial, that a Government witness

was permitted to make unresponsive answers that violated the rights of Kelly and Hagen not to incriminate themselves by testifying, and that in general the rulings of the trial judge were so uniformly favorable to the prosecutor as to place him in the role of an advocate.

It is also claimed by appellants Kelly and Hagen that the procedures by which the Grand Jury was selected in the Southern District of New York were so inadequate, biased and generally unlawful as to require the dismissal of the indictment as to them.

In addition to the arguments addressed by counsel for Shuck to the severance and conspiracy phases of the case, above referred to, this appellant claims the admission of the post-conspiracy testimony of Kelly and Hagen before the SEC and the Attorney General of the State of New York was prejudicial error as to him and not cured by adequate cautionary instructions to the jury. It is also asserted on behalf of Shuck that the failure of the trial judge effectively to curb the "campaign" of counsel for Kelly and Hagen, throughout the trial, "to vilify and besmirch Shuck by inflammatory statements, improper questions and misstatements of fact," deprived him of a fair trial. Shuck also claims the evidence was not sufficient to warrant the submission of the case against him to the jury with respect to each and all counts, i. e., 1, 93, 105 and 107.

Obviously, it is not possible to test the validity of these multifarious claims of error without a pretty complete understanding of the proofs, both testimonial and documentary. And yet, incredible as it may seem, counsel for all the parties prevailed upon the trial judge not to marshal the evidence supporting the factual claims of the prosecution and the defendants Kelly, Hagen and Shuck in his instructions to the jury. The voluminous briefs filed on behalf of Kelly and Hagen do not discuss the evidence, as a whole or in sequence, as they make no claim that the evidence was not sufficient to support the charges as against them, and even the Government brief is so condensed and conclusory on many critical phases of the evidence that we have had no alternative to going through this huge record of testimony and exhibits page by page. The result is set forth in the ensuing chronological statement of facts as the jury was justified in finding them. Neither Kelly, Hagen nor Shuck testified as a witness in his own defense.

## II

### Comprehensive and Chronological Review of the Evidence

The crimes of which appellants stand convicted revolve about the sale from late 1954 through 1956 of many millions of dollars worth of the unregistered common stock of Gulf Coast Leaseholds, Inc. Unwarranted public demand for this stock was stimulated by grossly exaggerated reports of Gulf Coast Leaseholds' activities and potential and by various manipulative techniques to which the over-the-counter securities market seems peculiarly susceptible. These machinations succeeded in driving up the price of Gulf Coast stock from something over $1 per share to more than $15, notwithstanding huge losses sustained by the company.

The appellants are Cecil V. Hagen, a petroleum engineer who founded and controlled Gulf Coast Leaseholds; Roy B. Kelly, an attorney who served as the company's general counsel and was an occasional officer and director; and Milton J. Shuck, a securities dealer who passed on to the investing public more than $3,000,000 in Gulf Coast stock.

The crucial question submitted to the jury was did the appellants "willfully" violate the federal securities laws [1]

---

1. Section 24 of the Securities Act of 1933, 15 U.S.C. § 77x, entitled "penalties," provides as follows:

 "Any person who willfully violates any of the provisions of this subchapter, or the rules and regulations promulgated by the Commission under authority thereof * * * shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both."

or, *per contra*, were they simply and innocently conducting "business as usual." The Government introduced one piece of evidence after another to demonstrate that Kelly and Hagen were quite familiar with the requirements of the federal securities laws and deliberately tried to evade them, that Kelly and Hagen had very substantial reasons for not wanting to disclose the true state of Gulf Coast's affairs and for making and authorizing numerous misrepresentations, and that these appellants reaped well over $1,000,-000 in profits and secret kickbacks and under-the-table payments at the expense of the public. As we review the voluminous evidence presented to the jury we are guided by the "long established principle" that "[o]n appeal the evidence must be considered in a light most favorable to the Government." United States v. Dardi, supra, 2 Cir., 1964, 330 F.2d 316, at 325, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50.

In July 1951, appellant Cecil V. Hagen was president of the Manabi Exploration Company which owned substantial oil interests in Ecuador and a very small number of non-producing and undeveloped oil leases situated in the Gulf Coast area of Texas. At that time it was decided to separate Manabi's foreign properties from its domestic interests and Gulf Coast Leaseholds was formed for the purpose of exploring and developing Manabi's small holdings in the United States. The original assets of Gulf Coast Leaseholds consisted of these domestic leases, valued at $32,000, and an additional $16,000 in cash provided by Manabi. In exchange for these assets, Gulf Coast Leaseholds issued on a pro rata basis about 12,500 shares of its new stock to the Manabi shareholders.

During the first two years of its existence, Gulf Coast Leaseholds engaged in limited exploratory and development work and almost all of its income and expenses derived from the purchase and sale of non-producing properties. By May 31, 1953, Gulf Coast's reported deficits totalled about $60,000. In July 1953, the company decided to expand its activities and engaged the Second National Bank of Houston (now known as the Bank of the Southwest) to serve as its transfer agent. The Gulf Coast shareholders approved a six-for-one split of the company's stock, increasing the number of outstanding shares from 30,000 [2] to 180,000. Bank documents revealed that immediately prior to this stock split, Hagen was the record owner of slightly more than 3400 shares and Kelly appeared as record owner of 600 shares. It seems clear, however, that Hagen also held a substantial, though indeterminable, block of shares whose record owners were his nominees.

At the same time that Gulf Coast was splitting its common stock six-for-one, an attempt was made to raise $300,000 through the public offering of a newly created class of convertible preferred stock. Because of its relatively small size, the offering fell within the "small issues" exemption afforded by the Securities Act of 1933; [3] the shares, accordingly, were not registered with the Securities and Exchange Commission and public disclosure was made through a short form (Regulation A) prospectus. The offering of these preferred shares was only partially successful and Hagen eventually bought more than one-third of the 60,000 shares offered, while Kelly purchased approximately 1000 shares.

In the Fall of 1953, the company started a program whereby it acquired vari-

---

2. The number of outstanding Gulf Coast Leaseholds shares had been increased from 12,500 to 30,000 in the following manner: On March 14, 1952 an option covering 7500 shares was granted to certain shareholders who signed a Gulf Coast note for $150,000; at least 3000 of these shares went to Hagen. On May 19, 1952 a stock option plan for Gulf Coast employees was approved by the shareholders; Kelly received 400 of the 2000 shares issued under this plan. Finally, on April 10, 1953 the Gulf Coast board of directors authorized a private sale of about 7800 shares to the Houston brokerage firm of Crockett & Co.

3. Section 3(b) of the Securities Act of 1933, 15 U.S.C. § 77c(b).

ous interests in Texas oil wells and properties in exchange for its common stock. The Government's detailed proof of these transactions demonstrated that Hagen, and to a lesser degree Kelly, had substantial interests in the entities selling property to Gulf Coast Leaseholds. The first two transactions were consummated on October 29, 1953. Gulf Coast Leaseholds acquired all the assets of Hickory Petroleum Corp., originally valued by Gulf Coast at $100,000, in exchange for 25,000 shares of Gulf Coast. These shares were issued without registration on the strength of a "no action" letter received by Kelly from the Securities and Exchange Commission to the effect that the shares were exempt from registration as a merger was involved.[4] Nearly one-third of these 25,000 shares were subsequently transferred to Hagen when Hickory Petroleum was dissolved. In the second October 29, 1953 transaction, Gulf Coast purchased properties owned by one L. L. Beeson and valued at about $84,000 by issuing some 21,000 of its shares. As Hagen had a three-quarter interest in the properties supposedly owned by Beeson, three-quarters of these shares eventually found their way to Hagen.

By far the most significant of the "insider" transactions occurred in March 1954. Early in 1954, Hagen and Kelly obtained a controlling interest in the Texas Northern Oil Corporation. As Hagen and Kelly represented that they were buying the Texas Northern stock for investment purposes and not for resale, these shares were not registered but restrictive legends were stamped upon the certificates indicating that they were "investment" shares and not freely transferable. Kelly and Hagen also embodied their investment pledge in a formal letter of investment. In March 1954, Gulf Coast purchased all the assets of Texas Northern, appraised at about $920,000, for over 350,000 shares of Gulf Coast Leaseholds. Upon Texas Northern's subsequent dissolution, the 350,000 Gulf Coast shares were distributed to the former shareholders of Texas Northern including, of course, Hagen and Kelly, whose Texas Northern stock bore restrictive legends. Kelly, as counsel to Texas Northern, thereupon wrote to Gulf Coast's transfer agent, stating that it was not necessary to place similar legends on the Gulf Coast stock as Texas Northern had been dissolved and the restrictions applied only to Texas Northern stock. As a result of Gulf Coast's acquisition of Texas Northern, Hagen received 57,000 shares of Gulf Coast and an option to buy another 32,000 shares at $2.75 per share, while Kelly obtained 4000 shares of Gulf Coast and a similar option on an additional 24,000 shares.

In 1953, Gulf Coast operated at a net loss of $110,000 and was strapped for the cash necessary to explore and develop its new properties. As Hagen and Kelly were reluctant or unable to increase their already considerable investment, Gulf Coast was forced to seek outside financing. Soon after the Texas Northern acquisition, the number of authorized shares of Gulf Coast was increased from 600,000 to 2,000,000 and during the Spring and Summer of 1954, Hagen and Kelly approached numerous brokers, investment bankers and private individuals in an attempt to attract buyers for the new stock. These efforts, however, proved of little or no avail.

Among those approached in the endeavor to obtain financing for Gulf Coast Leaseholds was Miss Muriel Bailey, a customers' woman employed by the New York brokerage firm of Walston & Co., who had known Hagen and Kelly for several years. Following Walston & Co.'s refusal to participate in an underwriting of Gulf Coast stock, Miss Bailey was told by another of her acquaintances, John Van Allen, that he had heard of Hagen and desired an introduction to him. Miss Bailey passed on this information to Kelly and testified that she described Van Allen as "a man of mystery"

---

4. See SEC Rule 133, Sec. Act Rel. 3420 (1951). See generally 1 Loss, Securities Regulation 518–542 (2d ed. 1961).

who represented secret Swiss trusts and seemed affluent.

During mid-September 1954, Van Allen met Kelly in New York and preliminary negotiations for the sale of a large block of Gulf Coast stock began immediately. These negotiations were continued on September 15, 1954, when Van Allen paid a short visit to Kelly's law office in Washington. As no important transaction could be completed without Hagen's approval and Kelly was to leave on that day for Haiti and Venezuela, Van Allen was invited to meet Hagen in Houston where he could observe Gulf Coast's operations.

Van Allen immediately went to Houston and the general nature of the financing was speedily decided. Van Allen not only was shown several Gulf Coast Leaseholds oil fields, Hagen also gave him fifty reprints of a highly complimentary article about the company which had appeared in the September 1954 issue of *Oil* magazine. On September 20, 1954, Gulf Coast's board of directors adopted a resolution purporting to amend the company's charter by eliminating the preemptive rights of the shareholders. Hagen then joined Kelly in Haiti to iron out the details of the contemplated financing agreement.

Kelly returned to New York on September 29 and drafted a simple two-page agreement that was signed by Kelly and Van Allen the following day, September 30, 1954. According to this contract, the purchaser of the Gulf Coast stock was "Brandel Trust," an entity of the Duchy of Liechtenstein that Van Allen said he represented. On September 30, 1954, Brandel's Swiss bank deposits amounted to $20.80. The September 30 agreement was signed on behalf of Brandel Trust as follows: "Dr. Paul Hagenbach Per J.v.a." Hagenbach, a Swiss attorney, was the president of Brandel Trust, but he was actually more or less of a figurehead and Brandel's affairs were completely controlled by Van Allen.

Because of its central importance to this case, we quote in full in the margin [5]

5. "New York, New York
September 30, 1954

Brandel Trust,
c/o Bank Leu,
Bahnhofstrasse 32,
Zurich, Switzerland.

Gentlemen:
This letter will confirm the understanding between yourself and Gulf Coast Leaseholds, Inc. concerning the purchase by you of certain shares of common stock of Gulf Coast Leaseholds, Inc.

It is agreed that Gulf Coast Leaseholds, Inc will sell, and you will buy, the following number of shares at the price indicated on the dates set forth herein.

| Number of Shares | Price per Share | Date Purchased |
| --- | --- | --- |
| 100,000 | $1.00 | November 1, 1954 |
| 100,000 | $1.00 | December 1, 1954 |
| 65,000 | $1.50 | January 1, 1955 |
| 65,000 | $1.50 | February 1, 1955 |
| 70,000 | $1.50 | March 1, 1955 |
| 50,000 | $2.00 | April 1, 1955 |
| 50,000 | $2.00 | May 1, 1955 |
| 50,000 | $2.00 | June 1, 1955 |
| 50,000 | $2.00 | July 1, 1955 |
| 40,000 | $2.50 | August 1, 1955 |
| 60,000 | $2.50 | September 1, 1955 |
| 50,000 | $3.00 | October 1, 1955 |

It is agreed that you will have the right to call for the shares at the price indicated at any time on or before the dates set forth herein.

It is understood that, in the event you fail to meet any one of the commitments on the dates set forth and in the full amount of the shares indicated, the re-

the two-page agreement between Gulf Coast Leaseholds and Brandel Trust, executed September 30, 1954.

The charge that Hagen and Kelly conspired to publicly distribute unregistered shares of Gulf Coast Leaseholds stock and that they "willfully" participated in an unlawful distribution of this stock, rested heavily upon the proposition that the September 30 agreement was a complete sham and that Hagen and Kelly were fully aware of the fact that Van Allen had no intention of honoring any investment pledge. In addition to the testimony of Van Allen, the Government presented the following bits of evidence to show that the circumstances surrounding the execution of the September 30 agreement were totally inconsistent with any bona fide investment intent:

1. Hagen and Kelly did not investigate Van Allen's background before entering into the million dollar deal with him. Had such an investigation been made, Hagen and Kelly might have learned that on September 30, 1954 Van Allen was free on bail following an indictment in 1953 in the Southern District of New York for income tax evasion and that during the 1940's Van Allen had been permanently enjoined from engaging in the securities business in New York and New Jersey.

2. Hagen and Kelly demanded no proof of Van Allen's authority to act in Brandel Trust's behalf. Moreover, Hagen and Kelly made no attempt to determine whether Brandel had the financial ability to hold for investment 1.3 million dollars worth of stock. As above stated, Brandel's bank accounts totalled $20.80 on September 30, 1954.

3. In the light of Gulf Coast's dire need of cash, the arrangement for stepped-up prices was inconsistent with any legitimate investment intent. The Government argued that had a private placement really been contemplated there would have been no reason to provide for an escalation of prices rather than payment of the average price of about $1.70 per share. If, on the other hand, a public distribution was anticipated, the profits from Van Allen's resale of the lower priced shares would enable him to meet his commitments with respect to the higher priced shares.

4. Though the Texas Northern transaction previously discussed demonstrated that Kelly and, perhaps to a lesser extent Hagen were familiar with the placing of restrictive legends upon stock certificates and the execution of formal letters of investment, these simple methods of assuring that no public distribution would take place were not followed.

mainder of the agreement will be terminated and you shall have no further right to purchase the shares on the terms set forth.

It is understood that you are acquiring these shares for a group of not more than twenty-five (25) individuals who are obtaining the shares for purposes of investment and not for purposes of resale and that any shares other than to this limited group of individuals will be sold only outside the United States, it being understood that the sale contemplated herein is one exempt from the registration provisions of the Securities and Exchange Act and the various other Securities Acts applicable.

It is understood that you will obtain a proper proxy for the voting rights to the shares held by the individuals and that such proxy shall run in favor of the present management.

It is understood that your compensation for services rendered in connection with this purchase and sale shall be ten (10%) per cent of the total purchase price paid to the Company, such ten per cent being deductible as the shares are taken down each month, your total compensation to be One Hundred Thirty Thousand ($130,000.00) Dollars, payable only as the shares are acquired from the Company. It is further understood that you will make provision for compensating Walston & Co. for their services in connection with this financing.

If this is in accordance with your understanding of our agreement please indicate your acceptance of these terms in the space provided below, returning the original to the undersigned and retaining a copy for your files.

Very truly yours,
Gulf Coast Leaseholds, Inc.
By Roy B. Kelly

Accepted:—
Brandel Trust
By Dr. Paul Hagenbach
Per J.v.a."

5. Prior to the consummation of the Hickory Petroleum deal, Kelly secured a "no action" letter from the Securities and Exchange Commission. Though the Brandel transaction involved many times more stock, no similar procedure was adopted.

6. The provision in the September 30 contract to the effect that Brandel had the right to demand Gulf Coast stock at times earlier than the specified delivery dates was meaningless unless resales by Brandel or Van Allen were contemplated.

7. The 750,000 shares to be purchased by Brandel would have represented a serious challenge to Hagen's control of Gulf Coast if Brandel honored its promise to hold the stock; the challenge would be insignificant upon public distribution. Accordingly, the provision for proxies in Hagen's favor rather than the use of a voting trust or the stamping of a legend upon the stock restricting voting rights made sense only if a public distribution was contemplated.

8. By tracing the accounts of several American companies and Swiss trusts, the Government demonstrated that the contract provision for the payment of compensation to Brandel was actually a subterfuge masking the under-the-table payment of a $130,000 kickback to Hagen and Kelly.

Incriminating as all these circumstances were, the Government went much further in proving its case by presenting in great detail the events which followed the execution of the September 30 agreement. It is to those events that we now turn.

Gulf Coast Leaseholds stock, not being listed on any exchange, was traded over-the-counter. The over-the-counter market is serviced by the National Quotation Bureau which publishes the daily "pink sheets." These "pink sheets" list thousands of stocks together with the names of brokerage firms "making a market" in the stock by offering to buy it at one price (the "bid" price) and offering to sell at a somewhat higher price (the "asked" price). Likewise, the pink sheets also publish the bid and asked prices for each particular stock.

In the months prior to the September 30 agreement, the market for Gulf Coast Leaseholds was exceedingly thin. Though the bid price of Gulf Coast had reached about $3.00 per share in the Spring of 1954, following the announcement of the Texas Northern acquisition, the market for Gulf Coast subsequently declined to the extent that Gulf Coast stock could be obtained for about $1.25 per share on September 30, 1954. Even at that price, however, there were few, if any, takers.

Faced with this dismal market situation, Van Allen, immediately after signing the September 30 agreement, turned to an old friend and former employer, Irving Hertzberg, the president of the small New York brokerage firm of F. W. MacDonald & Co. On September 30, MacDonald & Co. entered the "pink sheets" as a broker interested in "making a market" in Gulf Coast stock and purchased several thousand shares for Van Allen's friends. As a natural result of this sudden "demand," the price of Gulf Coast began to rise and, within a few hours, the bid price reached $2.00 per share.

At this point, on the very day that Van Allen had agreed to purchase Gulf Coast stock "for purposes of investment," he began to sell to various persons who had been "tipped off" and to others attracted by the sudden activity. In the first week following the September 30 agreement, Van Allen sold about 48,000 shares at prices steadily ascending to $2.75 per share. Van Allen also made a direct sale of 100,000 shares at about $2.00 per share to one of his friends.

Under the terms of the September 30 agreement, the first block of 100,000 Gulf Coast shares was to be delivered to Brandel on November 1, 1954. Van Allen testified that this date was selected to give him the opportunity to· make the sales necessary for him to meet his initial $100,000 obligation. As noted previously, however, the contract provided that Van Allen could anticipate deliveries.

Van Allen quickly exercised this preroga-tive and informed Kelly that he needed some stock to cover his substantial sales. Van Allen requested that the shares be in negotiable form or "good for de-livery," i. e., that they be in certificates for one hundred shares or less and in the name of someone other than a person "controlling" Gulf Coast Leaseholds.

For some reason, as to which the record is hopelessly confusing, Hagen and Kelly did not respond to Van Allen's urgent appeals for stock by having Gulf Coast issue the necessary certificates. Instead, Hagen and Kelly engaged in a complicated series of transactions to pro-vide Van Allen with some of their own shares. When Hagen and Kelly exhaust-ed their readily available supply, they borrowed some shares from friends and had this stock delivered to MacDonald & Co. for Brandel's account. As much of this stock was in Hagen's name and in certificates of large denominations, the transfer agent, the Second National Bank of Houston, was required to go through a tortuous process to prepare the shares in negotiable form. By October 7, how-ever, some 30,000 shares had been broken down into one hundred share certificates and put in the names of Hagen nominees or other non-controlling persons. Mac-Donald & Co. received the certificates the next day, October 8, 1954. But 30,000 shares were not nearly enough to cover Van Allen's resales. During the balance of October, Hagen and Kelly made four additional shipments of negotiable Gulf Coast stock, bringing to 100,000 the num-ber of shares forwarded by them in the first month after the signing of the Sep-tember 30 agreement.

The budding conspiracy really began to blossom in October 1954. On October 19, the Gulf Coast board of directors held a special meeting and voted to ratify the September 30 agreement and to empower Gulf Coast's transfer agent to issue shares pursuant to the instructions of Gulf Coast officers. This special meeting also served to increase the amount of Gulf Coast stock owned by Hagen and Kelly. One resolution accepted the offer of Falcon Petroleum Corporation, which Hagen controlled, to sell property valued at $40,000 for 18,000 shares of Gulf Coast. Another resolution increased the conversion ratio for the preferred stock, which as mentioned previously had been issued in July 1953, to two shares of com-mon stock for each share of preferred; the resolution recited Hagen's ownership of 21,500 shares of preferred and Kelly's ownership of 1,000 shares.

On October 26, 1954, the president of Gulf Coast Leaseholds, Robert G. Behr-man, Jr., wrote a letter to the Second National Bank of Houston, enclosing a copy of the September 30 agreement and of the October 19 directors' resolution authorizing instructions to the bank by Gulf Coast officers. Behrman's letter, copies of which were transmitted to Hagen and Kelly, advised the bank that Brandel Trust had exercised its right to purchase the 200,000 shares due on November 1, 1954 and on December 1, 1954. The bank was instructed to issue to Brandel Trust one thousand certifi-cates of one hundred shares each and an additional certificate for 100,000 shares. The manager of the bank's stock transfer department immediately notified the Gulf Coast office that as the bank had no docu-ments showing who had the power to act for Brandel Trust, problems might arise should Brandel seek to transfer the stock. Behrman accordingly sent a second letter on October 26, directing that the shares be put in the name of F. W. MacDonald & Co.

The Second National Bank issued the 200,000 shares to MacDonald & Co. on the following day, October 27, 1954. The single certificate for 100,000 shares was immediately sent to Hagen to replace the shares he had forwarded to Brandel's account during October. MacDonald's president, Hertzberg, was apparently concerned about the huge shipment of negotiable securities and asked Van Allen whether the sale of this stock raised any legal problems. Van Allen suggested that Hertzberg check with Kelly, a law-yer, but Kelly said that as he represented

Gulf Coast, Hertzberg would be wise to consult independent counsel.

Within the next few weeks, Van Allen secured an opinion letter from an attorney, John M. Foley. The letter was dated September 16, 1954 and referred to the September 30 agreement as an "August, 1954 agreement." Foley's letter stated that as the market price of Gulf Coast stock had risen sharply since the execution of the agreement, the purposes of Brandel's "investment" had been achieved and it was free to sell the stock without running afoul of the federal securities laws. Foley authorized Brandel to exhibit the opinion letter to brokers. Subsequently, Van Allen supplied Hertzberg with another opinion letter, dated November 18, 1954, by Mortimer B. Burnside. This letter, like Foley's, also relied upon the proposition that no lack of a legitimate investment intent could be inferred from the mere fact that Brandel sold some stock after the market price of Gulf Coast Leaseholds had gone up.

On October 28, 1954, Kelly instructed the Second National Bank to send Van Allen copies of the daily transfer sheets of Gulf Coast, starting with the one for September 30. Kelly had been receiving copies of the daily transfer sheets since July 31, 1954, and his letter of October 28 to the bank requested that the sheets be sent to Van Allen "in the same manner that you send them to me."

On November 1, 1954, an officer of Gulf Coast instructed the bank to return the copy of the September 30 agreement which the bank had received on October 26. This letter of November 1 promised that a copy of the agreement would be resubmitted to the bank before the next delivery of stock to Brandel. Though Kelly at one time stated that he "insisted that a copy of [the] agreement be filed with the bank who was the transfer agent and they were aware of all of its provisions," there was no evidence that the bank ever again received a copy of the million-dollar agreement.

Despite all this cooperation by the Houston bank, it soon became obvious that Van Allen's sales were so substantial as to warrant the appointment of a second transfer agent in New York. On November 1, 1954, Kelly wrote a letter to Robert Swanson, assistant cashier of the First National City Bank of New York, inquiring whether the bank would be interested in becoming a co-transfer agent to facilitate the handling of the numerous transactions in Gulf Coast stock taking place in New York. Two days later on November 3, 1954, Kelly met with Swanson in First National City's Wall Street office. Swanson's memorandum of this conference indicated statements by Kelly to the effect that Gulf Coast had 1800-2000 shareholders, including one Clint Murchison, and that the East recently witnessed "considerable activity" in Gulf Coast Leaseholds stock. Pursuant to a request by the First National City Bank, Kelly wrote an opinion letter to the bank stating that although none of Gulf Coast's stock was registered, trading in the stock was legal as all the shares were exempt from registration for one reason or another. Shortly thereafter, the First National City Bank became co-transfer agent for Gulf Coast stock.

While all these events were taking place, Van Allen was selling huge quantities of Gulf Coast stock. To aid in this massive distribution, Van Allen enlisted the services of Singer, Bean & Mackie, then one of New York's largest over-the-counter brokerage houses. The firm agreed to "make a market" in Gulf Coast Leaseholds stock, thus adding its prestige to the mushrooming operation.

With his new ally, Singer, Bean & Mackie, and the promise of the increased efficiency to be afforded by the appointment of a New York bank as co-transfer agent, Van Allen soon exhausted the 100,000 shares of stock which had been delivered to him in negotiable form on October 27. Again Van Allen turned to Hagen and Kelly and again they came to the rescue. Hagen, who had received the single certificate for 100,000 shares on October 28, sent Van Allen 65,000 shares in the period between November 5 and

November 16, 1954. Kelly, for his part, succeeded in borrowing something over 15,000 shares from his "contacts" and transferred the stock to Van Allen. On November 12, 1954, Hagen's secretary wrote F. W. MacDonald & Co. as follows:

"Enclosed are 4,000 shares of common stock of Gulf Coast Leaseholds, Inc. issued per attached list. We have included one certificate of two thousand shares which Mr. Kelly is lending at this time so that you may have ample coverage until the new stock certificates are available for additional transfers."

With clockwork precision the "new stock certificates" became available. On the same date as this letter, November 12, 1954, Gulf Coast instructed its Houston transfer agent to issue 100,000 shares of stock to F. W. MacDonald for Brandel's account. The stock, which was to be issued in certificates of one hundred shares each, represented the 65,000 shares due, according to the September 30 agreement, on January 1, 1955, and 35,000 of the 65,000 shares due on February 1, 1955. 50,000 shares were shipped by the Houston bank to MacDonald & Co. that very day, November 12, 1954. The remaining 50,000 shares were sent three days later.

Not only did Hagen and Kelly facilitate Van Allen's distribution efforts by providing him with "ample coverage" and amazingly speedy service, they also tried to induce Clint Murchison to buy a large number of the shares covered by the September 30 agreement. On November 8, 1954, Kelly and Hagen sent Murchison a lengthy memorandum describing Gulf Coast's background and prospects and stating that Gulf Coast then had two thousand shareholders, though it was anticipated that this number would soon grow to three thousand in view of the strong demand for the stock and the fact that twelve brokers had entered the "pink sheets" to trade in Gulf Coast stock. The memorandum concluded with the following proposal:

"At the time of the private placement we had in mind that if the company increased in value we wanted to have shares available for you at a favorable price. We, therefore, made verbal provisions with the purchasing group that a block of from 50,000 to 100,000 shares would be made available to you at a price of approximately $2.75 per share. This, at the present time, is approximately $1.25 a share under the current market which is a strong one."

Whether Van Allen required any assistance in disposing of his Gulf Coast stock seems dubious indeed. During October and November 1954, Van Allen purchased for his own account 390,000 shares of Gulf Coast for $462,000. In this same two-month period, Van Allen sold 303,000 shares for $883,000.

On about November 11 or November 12, 1954, Mrs. Orlena Sparenberg, the manager of the stock transfer department of the Second National Bank of Houston, telephoned Gulf Coast's office to say that, contrary to the provisions of the September 30 agreement, some of the Gulf Coast stock issued pursuant to that agreement had been resold within the United States. Mrs. Sparenberg testified that the call was in no way prompted by any thought that the sales were illegal under the securities laws. Throughout cross-examination, Mrs. Sparenberg maintained that it was not the number of purchasers but rather the situs of the transfers which occasioned her telephone call. Mrs. Sparenberg testified that although the bank had returned its copy of the September 30 agreement, she recalled that the contract provided that Brandel would make no sales within the United States. Within a few days, Mrs. Sparenberg was told by the Gulf Coast office that Kelly, Gulf Coast's lawyer, had been informed of the situation, and he had said Brandel Trust was solely responsible for any domestic sales.

Mrs. Sparenberg's testimony assumed great significance when the defense introduced a letter supposedly written by Kelly on November 16, 1954 to Paul Hagenbach, the president of Brandel

Trust. This letter was to the general effect that the transfer agent had informed Gulf Coast officials that Brandel had transferred Gulf Coast stock to more than 25 purchasers, that Gulf Coast was under the impression that Brandel Trust intended to buy Gulf Coast stock "for the purpose of investment and not for resale," but that Kelly was sure that Brandel's actions had been "under advice of counsel" and Kelly simply wanted to know what was going on.

As the Government regarded this letter as a fabrication cleverly designed by Kelly, or some of the other conspirators with his knowledge, to give the false impression that his first knowledge of the sale of the unregistered stock was the result of the telephone call from Mrs. Sparenberg, it produced as a witness Hagenbach, the alleged recipient of the November 16 letter. He denied categorically that he had ever seen it and the defense conceded that Hagenbach never responded to the letter. Moreover, Mrs. Sparenberg's testimony that her call concerned the situs of the transfers and not the number of buyers was bolstered by bank documents proving that until November 18 it would have been impossible for Mrs. Sparenberg to know that more than 25 transfers had taken place. And, of course, the Government contended that evidence such as Kelly's letters to Swanson on November 1 and to Murchison on November 8 concerning the number of Gulf Coast shareholders and the strength of the demand for the stock, as well as the November 11 letter about providing "ample coverage," belied Kelly's claim that it was the bank which first put him on notice that Van Allen was reselling the shares he bought for investment.

On November 20, 1954, Kelly and Van Allen met in Paris from whence they journeyed, two days later, to Zurich. What occurred in Zurich was the subject of bitter controversy at the trial. The defense asserted that Kelly visited Hagenbach to protest that Brandel's sales violated both the securities laws and the September 30 agreement. The defense version of this alleged meeting was to the effect that Hagenbach insisted that Burnside, whose opinion letter we have mentioned previously, had advised Brandel that it was entitled to resell the Gulf Coast stock and that if Gulf Coast refused to continue delivering the stock, Brandel would sue and recover the substantial difference between the prevailing market price and the far lower contract price.

The defense also asserted that whenever Kelly complained to Van Allen that his sales violated the law and their agreement, Van Allen referred to Burnside's opinion and threatened suit should Gulf Coast fail to deliver the promised stock. The defense, however, apparently conceded that Burnside was more of a stockbroker than a practicing attorney. The Government, accordingly, stressed the sheer improbability that Kelly, a lawyer would have been intimidated by such a "legal" opinion. And, of course, no one can reasonably dispute that the evidence was sufficient to permit the jury to conclude that Hagen and Kelly, far from being coerced by Van Allen, Hagenbach and Burnside, were actually willing partners in the massive distribution of Gulf Coast stock

The Government presented an entirely different version of what went on while Kelly and Van Allen were in Zurich. Hagenbach, who came to the United States and apeared as a Government witness after receiving a written promise by a duly authorized Assistant United States Attorney that the Government would move to dismiss the case against him, not only denied receipt of the November 16 letter by Kelly referred to previously but he also denied meeting Kelly at any time prior to February 1956. Van Allen testified that he and Kelly went to Zurich in November 1954 because Kelly wanted to form a secret Swiss trust. This trust was to receive the ten per cent payments which the September 30 agreement described as compensation for Brandel but which were actually being made as kickbacks to Hagen and Kelly. Two previous payments of $10,000 each had been made by Brandel on October 11, 1954, three

days after Hagen first delivered Gulf Coast stock to Brandel's account at MacDonald & Co., and on November 4, after the Houston bank shipped 100,000 shares in negotiable form on October 27. These two checks totalling $20,000 wound up in the bank account of Potomac Enterprises, Inc., a company which Hagen and Kelly admitted they owned. Though the defense sought to explain these payments by saying they were loans, there was no explaining the lack of any evidence that Potomac Enterprises ever repaid these "loans" or the coincidences that these "loans" occurred immediately following shipments of Gulf Coast stock to Brandel's account and that these "loans" equalled ten per cent of the purchase price of the shares then delivered, the precise figure specified by the September 30 agreement as "compensation" to Brandel.

Van Allen testified that he introduced Kelly to a prominent Zurich attorney, Dr. Walter Keller-Staub. In consideration of $25,000 paid by Van Allen, Keller-Staub formed a secret Swiss trust, Universal Finance Company, for Hagen and Kelly, and another trust, Sun Investment Company, for Van Allen. Questions as to who exactly owned these secret trusts became highly significant when the Government proved that transfers of substantial amounts of cash from Sun Investment to Universal Finance represented payments by Van Allen to Hagen and Kelly of the balance of the $130,000 kickback.

On December 6, 1954, immediately after Kelly and Van Allen returned to the United States, there began a complicated series of stock transfers designed to repay Hagen for the 65,000 shares of Gulf Coast which he had delivered to Brandel between November 5 and November 16, 1954. Gulf Coast, on December 6, instructed the Houston bank to deliver to the Gulf Coast office a single certificate for 65,000 shares issued in the name of F. W. MacDonald & Co. This stock was said to represent the remaining 30,000 shares which Gulf Coast was supposed to deliver to Brandel on February 1, 1955

and 35,000 of the 70,000 shares due, under the September 30 agreement, on March 1, 1955. On December 9, 1954, the Houston bank accordingly sent a single certificate for 65,000 shares in the name of F. W. MacDonald & Co. and bearing the certificate number C2157 to the Gulf Coast office. This stock never reached MacDonald. Instead, on December 15, 1954, Gulf Coast returned certificate number C2157 to the Houston bank and directed it to reissue the 65,000 shares to Hagen and one of his friends.

Notwithstanding this brilliant coup, the conspiracy soon experienced its first serious setback. On December 17, 1954, Van Allen met with his advisor, Burnside, Herbert Singer of Singer, Bean & Mackie, and Singer's attorney, Joseph Connolly. According to Van Allen's testimony, this conference had been preceded by a series of questions from Singer, Bean & Mackie regarding the legality of the distribution of Gulf Coast stock. Burnside apparently failed to convince Singer's lawyer that the substantial increase in the market price of Gulf Coast stock justified Van Allen's resales, for Connolly told Singer that he would accept no responsibility for any future sales by Singer, Bean & Mackie of Gulf Coast stock. The firm heeded Connolly's warning and immediately ceased trading in Gulf Coast stock on behalf of Brandel; Singer, Bean & Mackie continued, however, to trade in Gulf Coast for the firm's own account.

Unperturbed by, and perhaps unaware of, this development, the Gulf Coast office on the very next day, December 18, 1954, instructed the Houston bank to deliver 35,000 shares in one hundred share certificates to Brandel's account at MacDonald. This stock was to complete the delivery due under the contract on March 1, 1955. Though some inconvenience might be expected from the partial withdrawal of Singer, Bean & Mackie, the conspirators could be content with the fact that they were about 2½ months ahead of schedule. And during December 1954, Van Allen managed to dispose of almost 42,000 shares of Gulf Coast at

an average price of slightly more than $4 per share.

Whether to forestall an SEC investigation or in an outside hope that some form of approval or qualified approval of the sale of the unregistered shares might be obtained or for some other undisclosed purpose, it was decided that Kelly should visit the Washington office of the SEC. Accordingly, Van Allen arranged a meeting, held January 11, 1955, between Kelly and Edward T. Tait, the Executive Assistant to the Chairman of the SEC. As Tait was an administrative official rather than a legal advisor, he referred Kelly to Charles E. Shreve, an attorney in the SEC's Division of Corporation Finance. This Division was in charge of questions relating to stock registrations.

Shreve's testimony of what occurred at this conference of January 11, 1955 completely refutes Kelly's claim that he made a full and fair disclosure of all the material facts. Moreover, Shreve testified that the upshot of the conference was that it was recognized that the shares would have to be registered and Kelly promised that no more deliveries of unregistered stock would be authorized by Gulf Coast. According to Shreve, Kelly completely misrepresented the true situation to him.

Among the falsehoods and omissions were: Kelly's description of the purchasers as a "group of Swiss investors" rather than an anonymous Swiss trust; Kelly's representation that the sales price for the stock was "about $1.87 a share net," with no mention of the fact that the September 30 agreement provided for stepped-up prices; the failure to disclose that the "Swiss group" began reselling the Gulf Coast stock on the very day that the "investment" agreement was entered into and that Hagen and Kelly facilitated these resales by forwarding their own stock and having the transfer agent issue huge loads of certificates for one hundred shares each. Shreve's memorandum of the conference, Government Exhibit 921, was received in evidence solely for its bearing on Shreve's credibility.

On the same day as this Kelly-Shreve conference, Gulf Coast directed the Houston bank to issue 25,000 shares in one hundred share certificates to MacDonald & Co. The next day, January 12, 1955, Gulf Coast instructed the bank to send MacDonald another 25,000 shares in similar form. These 50,000 shares represented the delivery due on April 1, 1955, and the bank forwarded the stock on January 13, 1955. It was to be the last delivery from the Houston bank to MacDonald & Co. until March 26, 1955.

According to Van Allen's testimony, Kelly's report of his meeting with the SEC was to the effect that he had been quite successful and there was nothing for the group to worry about. Van Allen went merrily on his way distributing Gulf Coast Leaseholds stock to the public; his sales for January came to 36,300 shares at a total price of $180,000. It seems, however, that Hertzberg, the president of MacDonald & Co., still had some misgivings about whether he was doing right in selling all this unregistered Gulf Coast stock. On January 31, 1955, Hertzberg wrote a very short letter to Kelly asking Kelly's opinion as to whether these sales were legal. On February 1, 1955, Kelly's secretary acknowledged receipt of Hertzberg's letter and stated that Kelly was out of town on business. Kelly's response to Hertzberg, dated February 10, 1955, was to the effect that as he was counsel to Gulf Coast Leaseholds and not Brandel, he was in no position to pass upon the legality of Brandel's activities. Kelly's final sentence in this letter was: "In any event, the company is presently in the process of preparing a registration statement for Gulf Coast Leaseholds, Inc., which registration statement should be ready for filing in the comparatively near future."

Again Hertzberg had received whatever reassurance he needed and the Brandel account at MacDonald continued its activity in Gulf Coast stock. As noted previously, no shares covered by the September 30 agreement were issued during February 1955 by the Second National Bank of Houston. During this month,

however, the Brandel account at MacDonald bought on the open market more than 11,000 shares of Gulf Coast; this amount exceeded the sum of such purchases during the three preceding months. Sales for February 1955 totalled 32,000 shares at about $5 per share. Towards the end of the month, the Securities and Exchange Commission began an investigation of MacDonald & Co. Hertzberg quickly got in touch with Van Allen, who discussed the matter with Kelly; Van Allen then prevailed upon his advisor, Burnside, to pay a visit to the SEC in Washington.

A very short, almost cryptic, memorandum to the SEC's files by the administrative officer Tait indicates that Burnside and Tait probably conferred on March 2, 1955. Burnside apparently provided Tait with an unsigned and undated memorandum typed on three pages of plain white paper to the effect that Brandel Trust, "a Swiss financial corporation," had purchased a large block of Gulf Coast Leaseholds stock for purposes of investment. Subsequently, according to this memorandum, Gulf Coast discovered a large amount of oil and, as a result, the market price of the stock rose. "The Swiss group" thereupon determined that the purposes of the investment had been "met" and the group disposed "of a portion of their shares." The memorandum continued that "certain of the shares" were sold through MacDonald & Co. which recently informed Brandel that it had "on several occasions" received inquiries about these transactions from a representative of the SEC. The memorandum then went on to say that representatives of Gulf Coast "have had some discussions with the S. E. C." concerning the Brandel contract, and that Gulf Coast informed Brandel that it (Gulf Coast) "is not in a position to spend money for a registration statement as such a venture is both costly and time consuming to its management." The memorandum concluded with the statement that Brandel had the right to dispose of the shares as the purposes of its investment had

been "met by the increase in [Gulf Coast's] inherent value."

The significance of this memorandum was hotly disputed at the trial, though it was stipulated that the memorandum had been typed on a machine owned by Kelly. The defense argued that this was another example of the "complete disclosure" that Kelly was making to the SEC, and said that the purpose of the memorandum was to advise the Commission that the Gulf Coast shares would not be registered. The Government contended that honest disclosure is not usually made through an unsigned and undated memorandum and that the facts set forth in the memorandum were just about as incomplete and inaccurate as those recited by Kelly to Shreve in their January 11 conference. Finally, the Government asserted that the reason why this document was executed and brought to the SEC's offices derived from the conspirators' hope that it would be "planted" in the Commission's files and would be thought to represent an internal memorandum of the Commission concluding that it was unnecessary to register the Gulf Coast stock.

Van Allen testified that Burnside reported back to tell him that the meeting with the SEC had not been successful and that the shares ought to be registered in the interest of avoiding trouble. According to Van Allen, Kelly's response was that Gulf Coast did not want and could not afford to spend the money.

Later in March 1955, Gulf Coast Leaseholds released its Annual Report for the year ending December 31, 1954. The loss reported for the year was $257,000. As we have stated, the company's reported loss for the year ending December 31, 1953 had been $110,000. The message of the president of Gulf Coast, Robert G. Behrman, Jr., which constituted the four pages preceding the company's financial statements, discussed the increase in Gulf Coast's oil and gas production, the company's active drilling program, the purchase by Gulf Coast of various productive properties including the acquisition of Texas Northern

Oil Corporation which we have previously outlined, the soundness of Gulf Coast's financing and the plans of Gulf Coast's management "to greatly expand operations in 1955." Behrman's message concluded with the statement: "The net loss, not at all unusual for oil companies in initial stages of development, resulted primarily from GCL's share of dry hole and completion costs. * * * We anticipate that with income substantially advancing and dry hole costs diminishing, our next annual report should show Gulf Coast Leaseholds operating at a profit." Release of this Annual Report occasioned only a very minor and very temporary decrease in the market price of Gulf Coast stock.

On March 25, 1955, a few days after the Annual Report was published, Gulf Coast instructed the Second National Bank of Houston to resume the issuance of stock pursuant to the September 30 agreement; as we stated previously, the issuance of such stock had been discontinued on January 13, 1955. The Houston bank was directed to issue to the Brandel account at F. W. MacDonald & Co., 100,000 shares of Gulf Coast in certificates of one hundred shares each. The shipment, completed the following day, March 26, 1955, represented the shares due on May 1, 1955 and June 1, 1955.

The Government contended that one substantial reason why Gulf Coast agreed to provide Van Allen with these 100,000 shares, was a payment of $80,000 by Van Allen to Kelly and Hagen. According to the Government, this payment was part of the ten per cent kickback arrangement which we have discussed. The Government introduced a letter written on March 26, 1955 by Van Allen to Dr. Walter Keller-Staub, directing the Swiss attorney to transfer $80,000 from Sun Investment Company, which was Van Allen's Swiss trust, to Universal Finance Company, the secret Swiss trust which belonged to Hagen and Kelly.

Van Allen's sales for March 1955 came to 50,000 shares at an average price slightly in excess of $6 per share. On April 2, 1955, Gulf Coast directed the Houston bank to issue to the Brandel account at MacDonald another 50,000 shares in one hundred share certificates. This delivery, completed April 5, 1955 constituted the shipment due under the September 30 agreement on July 1, 1955. Once again the conspiracy was about three months ahead of schedule.

We have mentioned previously that on December 17, 1954 the account of Brandel Trust at the Singer, Bean & Mackie brokerage house was denied the privilege of trading in Gulf Coast stock, though the firm continued to deal in the stock for the firm's own account. Towards the end of March 1955, the firm's activity in Gulf Coast stock increased considerably, and on about April 15, 1955, Brandel Trust was again extended the privilege of executing transactions involving Gulf Coast. During the balance of April 1955, the Brandel account at Singer, Bean & Mackie sold 6550 shares of Gulf Coast at an average price of about $8 per share. Brandel Trust's total sales figures for April 1955 were 72,000 shares sold at a price of $530,000.

We now approach the "second stage" of the conspiracy, relative to the debentures. It is probable that the precise course of events cannot be traced in this record but the documents are illuminating and some of the gaps are filled by testimony. In any event, up to May 1955, Van Allen and the others working with him boosted the price of Gulf Coast stock by touting, but principally by the manipulation of the market, buying and selling. As early as October 7, 1954, Kelly, Hagen and the Gulf Coast office sent on to Van Allen every scrap of information they could lay their hands on. As we shall soon see, the efforts to cause a real boom in the stock were later doubled and redoubled. By way of anticipation, and to facilitate an understanding of the sequence of events, we mention here the fact that a document dated May 26, 1955, signed by Van Allen for Brandel and by Kelly for Gulf Coast, evidenced an agreement to sell Brandel $1,000,000

of Gulf Coast debentures, convertible at $8.00 per share. Reminiscent of the 10% kickback on the purchase of the 750,000 shares, Brandel was to receive 10% of the debentures but not in excess of $100,000. A note from Kelly indicated the debentures were to be issued "on a private placement basis and not subject to SEC registration." The final agreement, for the purchase of $2,000,000 of debentures to be registered with the SEC, was enclosed by Kelly to Van Allen in a letter of August 25, 1955. This agreement, however, bore the date of May 17, 1955 and recited a ratification at the directors' meeting of Gulf Coast on May 18, 1955. In May the stock was selling at about $7. In August the market was above $10. It will be interesting to see when the peripheral defendant Shuck enters the scene, and how he comes in contact, if at all, with Kelly and Hagen. The three persons constituting the nucleus of the alleged single, over-all conspiracy were, of course, Kelly, Hagen and Van Allen.

On May 12, 1955, Gulf Coast instructed the Second National Bank of Houston to deliver 40,000 shares in one hundred share certificates to the Brandel account at F. W. MacDonald & Co. This stock represented the shares due on August 1, 1955, and was sent by the Houston bank on May 16, 1955. On May 24, 1955, the bank was directed to send another 60,000 shares in one hundred share certificates. This shipment, representing the stock due on September 1, 1955, was completed on May 26, 1955.

In between these two stock shipments there was a regular meeting of the Gulf Coast directors. While Kelly sent a long "night letter" from Houston to Van Allen in New York quoting a puffing news release, there is no reference to any new financing, and the testimony is to the effect that the subject of new financing was not mentioned at the May 18 board meeting.

It seems pretty clear that Kelly, Hagen and Van Allen were planning and negotiating for some time before the May 26, 1955 memorandum of agreement for

the sale of $1,000,000 of Gulf Coast convertible debentures was signed. There was much backing and filling as the conspirators laid their plans for even greater "profits" than they already had realized. First, the debentures were to be sold as another "private placement." Then the amount was increased to $2,000,000 and it was decided to register. Finally, the SEC raised so many objections to the registration statement that was filed that it was withdrawn. By that time the "private placement" had become quite impossible, and on November 8, 1955 it was agreed by Kelly and Van Allen that the purchase of the debentures should be for investment and not resale. Each debenture was to be stamped with a restrictive legend making resales impossible until November 17, 1956.

The Government relied strongly on the conduct of the principal conspirators in the interval between May 26, 1955 and the decision on November 8, 1955 to stamp the debentures and put them out of circulation. Indeed, the combination of these maneuvers was striking proof of the ingenuity and the utter unscrupulousness of those who constituted the hard core of the conspiracy.

At a time when it was still thought the "private placement" procedure could again be put across, it was decided that it would be well to obtain another opinion letter from a lawyer stating that all prior resales by Brandel of the 750,000 shares, received under the original contract of September 30, 1954, were legal. So, on June 7, 1955 Van Allen went to the Zurich office of Paul Hagenbach for the purpose of having Hagenbach, the Swiss attorney, who was president of Brandel Trust, write a letter to the SEC. This clever scheme was effected. Kelly had prepared the letter and Van Allen had it with him. It was to be addressed to "Securities & Exchange Company" in New York. Hagenbach promptly complied. The letter referred to the purchase of the 750,000 shares of Gulf Coast for investment and went on to state that following this purchase "certain of our clients suffered several finan-

cial reverses in other investments necessitating the liquidation of a portion of the investment in Gulf Coast." The letter also said that Brandel still owned 400,000 shares of Gulf Coast and planned no further sales. The final sentence in this letter was: "We are providing you with opinion of United States Counsel concerning our investment in these shares." Parenthetically, it should not surprise us to find that on the same day, June 7, 1955, the Houston bank was directed to issue the final lot of 50,000 shares due under the September 30 agreement. It is significant also that these 50,000 shares, in one hundred share certificates, were made out in the name of Singer & Co., a nominee of Singer, Bean & Mackie, who thus came back into the fold. This was the first time Singer, Bean & Mackie agreed to accept newly issued shares of Gulf Coast directly from the transfer agent in Houston.

The opinion "of United States Counsel," referred to in Hagenbach's (Kelly's) letter to the SEC turned out to be one by Jack N. Blinkoff, a specialist in SEC matters. It was dated June 29, 1955 and covered five pages of elaborate discussion of various grounds for the conclusion that the stock sold in September 1954 was exempt from registration as a private placement. The prosecutor was quite right when he branded this letter as "phoney" on its face. It was just as "phoney" as the Hagenbach letter, and full of glaring misstatements of fact. The activity of the Gulf Coast stock is attributed, not to the touting and the manipulation of the market by Van Allen and his cohorts, but to the unusual success of Gulf Coast's oil drilling. Blinkoff added: "All sales concededly were made by brokers in the ordinary course of business without any effort to influence the market, and without any attempt to solicit orders for the stock."

June 1955 was a big month for the conspiracy. Singer, Bean & Mackie had overcome whatever scruples or hesitation had made them cautious. Brandel's sales in June were 37,400 shares sold for $215,000. Also beginning in June 1955 a rash of circulars and reports by various brokers and investment advisers, extolling the many virtues of Gulf Coast stock, began to appear. Perhaps the earliest was a June 10, 1955 letter, one page in length, prepared by duPasquier & Landeau, members of the New York Stock Exchange. This letter stated that preparation was being made for a "prompt listing of the shares on the American stock exchange"; that "Amongst the Directors, Roy B. Kelly represents the important Murchison interests of Dallas"; that "the financial situation of the company is very good"; and concluded with the statement that "GULF COAST LEASEHOLDS seems a very interesting growth situation."

On June 27, 1955, a weekly bulletin put out by DuVal's Consensus, Inc., which boasted approximately 5,000 subscribers, contained a write-up of Gulf Coast Leaseholds. The bulletin stated, among other things, "that each of the 1.4 million shares outstanding is backed by over $35 of oil; a truly amazing sum for so young a producer" and that "Gulf Coast Leaseholds is believed capable of climbing to as high a price as $50 per share within the intermediate period." The bulletin concluded with the statement: "This 'Oil Man's Oil Stock' is rated *buy now* for large near term and intermediate profits." Two weeks later, on July 11, 1955, DuVal's weekly bulletin again wrote about Gulf Coast, reporting that the company "has just acquired some highly important claims in the oil district of Louisiana [which] are estimated to be worth close to $25 million." The bulletin concluded: "Gulf Coast is regarded as one of the 'hottest' outfits in the country today."

Perhaps the most significant of these reports was prepared by Singer, Bean & Mackie during July 1955. This two-page document was sent, on request, to hundreds of brokerage houses throughout the country. The paragraph headings, which were indented and featured prominently, were: "DYNAMIC EX-

PANSION"; "OUTSTANDING MANAGEMENT"; "GROWTH OF RESERVES"; "ACQUISITIONS"; "CURRENT EXPLORATION PROGRAM"; "URANIUM PLAY"; and "CAPITALIZATION." The "CONCLUSION" read:

"The history of Gulf Coast Leaseholds has been one of spectacular expansion under the direction of an outstanding management which has translated negligible initial assets into a well-rounded organization which derives a substantial and increasing monthly cash flow from the considerable oil and gas reserves controlled by the company. Attractiveness for the growth-minded investor is further enhanced by the fact that the company's operations are concentrated in the development of the type of natural resources which provide tax shelter in the form of depletion allowances and whose value has historically appreciated at a rate in excess of the continuing rate of overall inflation of the economy at large."

By far the most spectacular of all these items was a "Special Report" published by DuVal's on July 29, 1955. This one page "FLASH ANNOUNCEMENT!" had the following printed in large type:

"This Stock is Set for a Sudden, Extensive Price Spurt
We Urge You to Avoid Delay . . .
Place Your Purchase Order NOW—
BEFORE the Dynamic Ascent Begins.

Buy . . .
GULF COAST LEASEHOLDS, INC."

———◆———

The "Special Report" then repeated much of the information that had appeared in DuVal's weekly bulletin and stated: "WE FEEL VERY STRONGLY that those of you who BUY NOW—before the scramble for this stock develops—will cash in on one of the most dynamic climbs yet to hit the mammoth Over-the-Counter list."

All these sales messages soon produced the desired effect. Brandel's sales for July 1955 amounted to 37,300 shares at a total price of $254,000. For August 1955, the figures climbed to 110,000 shares sold for $1,100,000. And unlike the month of May 1955, when only 8750 shares were sold by Brandel but its purchases on the open market totalled more than 15,000 shares, in July and August almost no purchases on the open market were made by Brandel.

While all this touting and selling was taking place the debenture deal of May 26, 1955 was undergoing two changes, and the result of these was a few more fraudulent maneuvers. Gulf Coast was presented with an opportunity to buy a very large amount of property from the National Associated Petroleum Company. On August 30, 1955 Gulf Coast and National Associated entered into an agreement that required Gulf Coast to pay more than $2,500,000 in cash for the property it was to receive. So Kelly and Hagen persuaded Van Allen to buy $2,000,000 worth of debentures, instead of the $1,000,000 provided in the May 26 memorandum of agreement. In some way that is not entirely clear, the new arrangement was changed to require registration. This startling reversal of prior procedure was probably the result of insistence by Van Allen for his own protection. But, with the stock selling at over 10 how could the $8 conversion rate be justified? This was easy. On August 25, 1955 Kelly sent Van Allen a "duplicate original" of the purchase contract, and it turned out to be dated back to May 17, 1955 and contained the false recital of ratification at the May 18, 1955 meeting of the Gulf Coast board of directors.

On September 14, 1955 a registration statement covering the debentures was filed by Gulf Coast with the SEC, Hagenbach having signed the contract in due course on behalf of Brandel.

Still nothing to connect Shuck in any way with the alleged single, over-all conspiracy to distribute "grossly over-priced unregistered corporate securities to an uninformed and deluded investing public!"

At about this same time, formal procedures were instituted by Gulf Coast to have its common stock approved for listing on the American Stock Exchange. An important step towards the accomplishment of this goal occurred on October 5, 1955, when the Board of Governors of the American Stock Exchange approved the listing and certified this action to the Securities and Exchange Commission. Apparently, however, the SEC was dissatisfied with the financial statements in both the registration statement for the debentures and the listing application for the common stock. These difficulties with the SEC appear to have stemmed from questions as to whether Gulf Coast was providing full disclosure of the transactions during 1953 and 1954 through which Hagen and his associates acquired large amounts of Gulf Coast stock and whether Gulf Coast was accurately and properly estimating its oil reserves in the statements submitted to the SEC.

On November 8, 1955, Kelly and Van Allen executed a further modification of the debenture contract and agreed that the registration statement covering the debentures and on file with the SEC would be withdrawn and that Brandel would purchase the debentures for investment purposes and not for resale. A letter embodying the parties' intent to modify the debenture Purchase Contract provided that each debenture would be stamped with the following restrictive legend in order to assure that no resales would be made:

"These bonds (or warrants) shall not be sold, transferred and assigned, (or converted) within eighteen months of our agreement or before November 17, 1956 unless an effective Registration Statement has been filed with the Securities and Exchange Commission of the United States."

According to the letter, Brandel's reason for agreeing to this change of plans was "the lapse of time has convinced us that the debentures and warrants are so sound that we would rather hold them for investment and have no present intention to sell these bonds or warrants." Accordingly, the registration statement was withdrawn by Gulf Coast on November 28, 1955.

During September 1955, Brandel sold 26,000 shares of Gulf Coast at a price slightly in excess of $300,000; sales for October 1955 were 22,400 shares for $320,000. The price of Gulf Coast Leaseholds stock jumped from about $13 per share on October 3, 1955 to about $14 on October 4, 1955. On October 5, 1955, the day the American Exchange approved the listing of Gulf Coast stock, the price reached $15.375. As days passed with no announcement that the SEC had approved either the listing of the common stock on the American Exchange or the registration of the convertible debentures, the price began to fall.

Van Allen, Hagen and Kelly were all anxious to keep the price of Gulf Coast stock above $8 per share so that conversion of the debentures at that rate would result in a profit. Van Allen's interest in this was obvious; but the Government also showed that the agreement to give Brandel ten per cent of the debentures was a cover-up for another kickback to Hagen and Kelly. As this kickback, unlike the one for the original September 30, 1954 agreement which was in cash, involved the transfer of some $175,000 worth of debentures to Hagen and Kelly, they too had an incentive to see to it that the price of Gulf Coast exceeded $8 per share, the rate at which the debentures could be converted after November 17, 1956. And, of course, Hagen and Kelly had a general desire to maintain a high

price for Gulf Coast so that they could continue to reap large profits by selling the substantial holdings of Gulf Coast stock they had been acquiring over the years.

Shuck enters upon the scene for the first time. Thus he was the man who was entrusted by Van Allen with the responsibility of keeping up the price of Gulf Coast Leaseholds stock through a selling operation that was frequently characterized at the trial as a "boiler room." Shuck's role in the market support activities was approximately as follows: in consideration of under-the-table payments by Van Allen, Singer, Bean & Mackie agreed to purchase shares of Gulf Coast Leaseholds offered on the open market; this stock would then be confirmed through one of two brokerage firms (De-Pontet & Co., a member of the New York Stock Exchange, and Stahl, Miles & Co., Ltd. of Edmonton, Canada) controlled by one of Van Allen's friends, Charles R. Stahl, to M. J. Shuck Company, the trade name by which Shuck did business; Shuck's firm would then resell the stock to members of the public who would be persuaded to hold the stock for substantial periods of time and thus keep it from returning to the market where it would have a depressing effect. Van Allen testified, however, as to the part played by Singer, Bean & Mackie, that Shuck "didn't know about that."

The original understanding between Van Allen and Shuck was that Van Allen would pay Shuck the equivalent of a ten per cent discount on the price Shuck was paying for the stock. Shuck insisted that his dealings be with a brokerage house that was a member of the New York Stock Exchange. This turned out to be De-Pontet & Co. above referred to. For some reason which is not entirely clear, this arrangement proved unsatisfactory and Shuck refused, in December 1955, to buy any more Gulf Coast stock. During the period between November 7 and December 13, 1955, however, Shuck purchased about 55,000 shares of Gulf Coast Leaseholds. Just about all of these shares were resold to the public by February 1956

when Shuck and Van Allen effected a reconciliation and Shuck re-entered the picture.

Shuck's *modus operandi* was graphically portrayed by Martin Teller who had served as the manager of the Shuck salesroom specializing in Gulf Coast Leaseholds. Teller pleaded guilty in this case and during 1962 he also pleaded guilty to two unrelated charges of violating the federal securities laws, one plea being made in Connecticut, the other in Ohio. In 1931, Teller had been convicted of receiving stolen goods and in 1932 he was convicted of mail fraud. Shuck hired Teller in September 1955 after establishing that Teller had no convictions during the preceding ten years, the period specified by the National Association of Securities Dealers, which Shuck joined in May 1955.

Teller's first job for Shuck was as a telephone salesman and he worked at 39 Broadway, in downtown Manhattan, where Shuck had his own office. In September 1955, when Teller was hired, Shuck's main interest was in selling a stock named Great Sweet Grass Oil & Gas and Teller began selling this stock over a telephone monitored by Shuck. Shuck was apparently impressed by Teller's ability and soon offered to make him the manager of a salesroom located at 89 Broad Street, a short distance away. Teller was also given the responsibility of recruiting the salesmen for this room and it seems that at least one of the approximately 25 men hired had been convicted of stock fraud during the 1930's.

Shuck's sales campaigns worked essentially in the following manner. Shuck would rent mailing lists from various financial magazines, mail order houses, securities firms and other establishments. These mailing lists would be turned over to a mailing staff consisting of about twenty or more girls who would send each person on the list a "lead-getter," which was basically an invitation by M. J. Shuck Company to supply the prospective customer with information and advice about the stock market. At times, the "lead-getter" referred to no stock in

particular but simply offered financial advice in general; at other times, the "lead-getter" would cite a specific stock as one about which M. J. Shuck Company, with its Wall Street location, knew something. Sometimes, the "lead-getter" would even provide detailed information about the particular stock which M. J. Shuck was pushing.

Soon after Shuck became interested in Gulf Coast Leaseholds he circulated a one-page mimeographed sheet about the company through the medium of his "lead-getters." This information sheet, dated November 20, 1955, was strikingly similar in every respect to a report drafted on November 1, 1955 by Van Allen's friend Charles Stahl. Stahl testified that Kelly was given a copy of his draft on November 1, 1955 and dictated several changes to one of Stahl's secretaries. Stahl then gave Van Allen six mimeographed copies of this draft as modified by Kelly, but Stahl's firm, DePontet & Co., did not publicly distribute the report until December 8, 1955.

The Shuck and Stahl reports traced the "remarkable progress" made by Gulf Coast Leaseholds during the year of 1954. Statements were made that during the year net oil production had increased from 480 barrels a month to 3840 barrels, reserves grew from "only 2,240,000 barrels" to "4,800,000 proven oil reserves" and the "income" went from "only $8200 a month" to "as high as $14,250 in December 1954." According to these reports, the company "was earning $27,000 per month" in March 1955 and since the summer "earnings have increased to $80,-000 per month and we understand they have risen to $140,000 per month to date." The reports stated that it was expected that "before the end of this year the company will earn somewhere in the vicinity of $170,000 per month." The reports went on to discuss various property acquisitions, drilling plans and financing, and also disclosed a drilling agreement with Clint Murchison, which we shall explain in due course. The reports concluded with the suggestion that a merger between Gulf Coast and various companies controlled by Murchison and Hagen "could be a likely and logical development," and the statement that listing of the common stock of Gulf Coast had been approved by the Board of the American Stock Exchange and "is now pending clearance by the SEC, after which the listing will be effected."

Shuck also printed up a four-page brochure about Gulf Coast. The first page of this brochure was as follows: on the top, there was printed in large letters "GULF COAST LEASEHOLDS, Inc."; most of the page was devoted to a large picture of an oil well and tanks with the caption, in small letters, "Oil from Gulf Coast Leaseholds' North League City Field is flowing into tanks"; the picture and caption were enclosed in a box and beneath the box was the following legend in fairly small type: *"Reprinted from 'OIL,' The newsmagazine of the Petroleum Industry, Vol. XIV No. 3."* Beneath this legend and in larger letters was: "M. J. SHUCK CO. 39 Broadway New York 6, N. Y. BOwling Green 9-2500." The other three pages of the brochure consisted of various graphs demonstrating the growth of oil production, reserves and gross monthly income, and an "analysis," similar in many respects to the earlier reports of why Gulf Coast Leaseholds was such a smart investment. These latter three pages in the brochure were all prepared by Shuck on the basis of Stahl's draft, the Gulf Coast Annual Report for 1954, and other materials, and had never been published in any issue of *Oil* magazine.

Whether or not the initial mailing from Shuck to the prospective customer contained any information about a particular company, it invariably invited the recipient to convey his interest in Shuck's services through the medium of an enclosed reply card or a stamped envelope addressed to M. J. Shuck Co. It appears that Shuck could anticipate that about two per cent of the people receiving a "lead-getter" would respond. Upon receiving these answers, Shuck would mail additional materials about Gulf Coast and

again invite a response "without any obligation on your part."

Only after a prospective customer had expressed his interest on two or more occasions would his name be placed on a list of people destined to receive telephone calls from M. J. Shuck Co. These lists were then broken down into individual cards which were given to relatively inexperienced salesmen, dubbed "openers," who would attempt to make the first sales. Teller distributed these cards on the basis of ability; the more capable salesmen were furnished with the names and phone numbers of persons living further away than those given the less capable. Teller stated that there were about "2000 variations" in the standard line or "pitch" for an "opener" and Teller then testified about the proper way to close a sale.

Depending on the resistance level of any particular customer, variations would be introduced into this "pitch." Thus, the opener might bandy around the Murchison name, or mention that a merger between Gulf Coast Leaseholds and one of the "majors" was going to take place, or start computing the profits that would accrue when the stock reached $50 per share. And once a customer had taken the bait, M. J. Shuck was not through with him. His name would be placed on a list provided to super-salesmen known as "loaders." These "loaders" had a "pitch" of their own and it was their job to see to it that the customer bought all the Gulf Coast stock he possibly could by suggesting that the customer dispose of his other stock holdings. The "loader" would predict a $100 future for Gulf Coast and tell the customer about how wonderful things would be when Gulf Coast hit the American Exchange, as it would any day now. And to make sure that the customer would hold on to Gulf Coast, the "loader" would explain to him the beauties of capital gains taxation. Teller's testimony about these "pitches" was corroborated in many details by various witnesses who had been lured by them into purchasing Gulf Coast Leaseholds. And it

was Teller's testimony that Shuck was pretty much aware of what was going on in the salesroom.

In the meantime, the affairs of Gulf Coast Leaseholds were proceeding apace. During December 1955, the company entered into an agreement, effective as of October 5, 1955, with the Weston Drilling Company whereby Weston agreed to invest about $2,000,000 in the drilling of those Gulf Coast properties which Weston was satisfied contained commercially productive oil reserves. Weston was to receive its outlays plus five per cent of the profits from any oil recovered on these lands. Not the least significant element in this transaction was the fact that Weston Drilling Company was controlled by Clint Murchison. Though the agreement with Weston was nothing more than an option on Weston's part, Kelly and Hagen went around telling Van Allen, Stahl and many others that Murchison had made a firm commitment to invest $2,000,000 in the future of Gulf Coast Leaseholds. In fact, Weston invested only about $100,000 before deciding that it could do without drilling properties owned by Gulf Coast Leaseholds.

To help expedite the SEC's approval for the listing of Gulf Coast common stock on the American Stock Exchange, Van Allen, on December 2, 1955, executed an affidavit which was submitted to the Commission. In this affidavit, which Van Allen testified was prepared by Jack N. Blinkoff, the lawyer who drafted the June 29, 1955 opinion letter which we have already discussed, Van Allen set forth the "circumstances" in which Brandel and Gulf Coast executed the September 30, 1954 agreement and the reasons which led Brandel to sell some of the Gulf Coast stock which it had bought for investment. The affidavit was a refinement of Blinkoff's letter and in it Van Allen stated that he was an employee of Brandel Trust, at an annual salary of $50,000, and that he had been instructed by his employer to execute the agreement of September 30, 1954 "after considerable negotiations." The affidavit continued that Van Allen had subsequently been in-

formed by his employer that "one or two of the participants of the Brandel Trust * * * found it necessary to liquidate certain shares in order to immediately obtain American dollars," and this was followed by sales to three individuals who knew all about Gulf Coast Leaseholds and promised to hold the stock for investment. The affidavit went on to say that as a result of Gulf Coast's various successes the price of its stock increased. Afterwards Van Allen was informed that Brandel incurred losses in some of its other investments and that Brandel decided to sell some Gulf Coast "gradually * * * in the event that bids were received." At the trial, Van Allen testified that this affidavit was completely false.

We have already indicated that during the Summer of 1955 DuVal's Consensus developed the habit of issuing spectacular reports about Gulf Coast Leaseholds to its 5000 subscribers. In its weekly bulletin published January 16, 1956, DuVal's Consensus featured another write-up of Gulf Coast. The bulletin started off by saying how well those investors who followed the original recommendation to buy when Gulf Coast was selling at $7.50 were doing now that it was selling at $13. The write-up went on to say:

"We believe, however, that considerable further upside potential exists —and this issue's expected admission to trading on the American Stock Exchange during the next few days should serve as the signal for a major price advance. That Exchange has already accepted Gulf Coast for listing. And the inside word is that the formality of Governmental clearing of this high grade oil and natural gas security is concluded, and about ready to be announced."

DuVal's then began to talk about how since the beginning of 1954 "Gulf Coast Leaseholds has expanded its daily oil output more than a hundred fold, has quadrupled its oil and gas reserves, and has increased average monthly income by an amazing 1500%" to the "vicinity of $170,-000 per month." According to DuVal's, the company had recently increased its reserves by "acquiring properties containing 70 proven well sites and 8.7 million barrels of proven oil reserves." DuVal's final paragraph was as follows:

"Gulf Coast should shortly announce it is producing ten thousand barrels daily, and its completion of over thirty new wells. The scheduled 1956 drilling of as many as 150 wells will add substantially to the almost 400 oil and gas wells now producing in six states. The firm could soon figure in an important merger which should afford added appreciation appeal. This is a definite 'Buy' recommendation for immediate purchase at the market. A speedy rise is foreseen."

This write-up of DuVal's Consensus prompted two ingeniously worded letters, one by Hagen of January 26, 1956 to DuVal and the other by Kelly of January 28, 1956 to Hagen. The motive is revealed by the fact that copies of each letter were sent to the Texas and Washington offices of the SEC. Hagen berates DuVal in strong terms for including false and misleading statements in his write-up. Near the end of this long, detailed 3-page letter appeared the following two paragraphs:

"We feel that the publication of false or exaggerated information to the buying public concerning Gulf Coast Leaseholds, Inc. is harmful, unequitable, unfair, and detrimental to the best interests of the public as well as the Company.

"As an individual, I am particularly disturbed over your use of my name in connection with the January 16, 1956 publication, because I did not provide any of this information to you for either report, nor would any of the officers or directors of the Company."

Kelly's letter is devoted to making excuses for DuVal and Kelly, on the face of the letter, is taking the blame on himself for the series of "honest misunderstand-

ings" by DuVal of statements that Kelly says he made to DuVal.

As if the SEC was not receiving enough fraudulent information about Gulf Coast Leaseholds, Hagenbach, the president of Brandel Trust, submitted an affidavit to the Commission early in February 1956. This affidavit covered much of the same ground as Van Allen's affidavit in December 1955 and Blinkoff's opinion letter of June 1955, and was just as false. Hagenbach stated that the Swiss secrecy laws prevented disclosure of the names of the "participants" in Brandel Trust, and he concluded as follows:

"To the best of his knowledge and information, all of the participants of Brandel Trust had been informed and had agreed and were willing to hold their stock for investment at the time of the purchase of the securities but that thereafter economic and other developments occurred to certain of the participants which in their opinion forced liquidation. Some of the participants have since regretted the necessity of liquidation since the stock has risen in price, but they felt they had no choice at the time."

Hagenbach's affidavit was duly authenticated by a Vice Consul of the United States in Zurich who attached the usual red ribbon to it. The spuriousness of the statements contained in this affidavit is, perhaps, best exemplified by the fact that on November 23, 1954, Hagenbach had prepared a document for Van Allen to the effect that Mr. and Mrs. John Van Allen were the sole owners of Brandel Trust.

But not even this stream of false information could budge the SEC into approving Gulf Coast's application for listing on the American Stock Exchange. On about February 15, 1956, Gulf Coast amended its listing application, stating: "As the result of additional knowledge obtained in producing the North League City Field during the last part of 1955 the company's geologists have substantially reduced their estimate of the commercially recoverable oil from this field."

The upshot of this "additional knowledge" was that Gulf Coast was writing down the value of its properties by more than $700,000. Much of this property had been acquired by Gulf Coast in the Texas Northern Oil Corporation and other deals in 1953 and 1954 in which Hagen and Kelly received many shares of Gulf Coast in exchange for their interests in these properties.

Towards the end of February 1956, as above stated, Shuck and Van Allen patched up their differences and Shuck agreed to resume his purchases of Gulf Coast from the firms controlled by Charles Stahl. It appears that Shuck was persuaded to rejoin the venture by a new "commission" agreement with Van Allen. The precise terms of this agreement are not clear to us. Van Allen testified he guaranteed Shuck a mark-up of 20%, but his method of calculating the 20% makes it look like something else. In any event, it is clear from Van Allen's testimony that the arrangement was for substantial payments in cash, under-the-table, that such payments were made and that one of the terms of the agreement was that, if a Shuck customer resold his stock in a short period of time, Shuck would lose his "commission" on that sale.

Upon his return to the full-time distribution of Gulf Coast Leaseholds stock, Shuck continued to circulate materials containing false and misleading statements. One Shuck letter began with the question, "Would you like to learn about a $14 stock with a $100 future?" This letter went on to talk about Hagen's former association with the Superior Oil Company and about Gulf Coast's production, reserves, gross monthly income, property holdings and drilling plans. It was also stated in this letter that "Murchison has recently advanced nearly $2,000,000 to the Company for drilling development wells." Shuck, of course, had been bandying Murchison's name about for some time and, as we have stated, the Shuck report of November 20, 1955, which was based on the Stahl draft of November 1, 1955, a document approved

by Kelly, contained two paragraphs devoted to linking Murchison with Gulf Coast Leaseholds.

Nevertheless, one of the Government's exhibits at the trial was a letter dated March 10, 1956, addressed to Shuck and written by Kelly. This letter upbraided Shuck for his using Murichson's name in a "recent release" and stated, "I do want you to know that we are pleased that your firm has an interest in the company. However, we feel that the statements made concerning Mr. Clint W. Murchison should not have been made." There was no evidence that Kelly had, in fact, mailed this letter to Shuck; and its use at the trial was supposedly limited to showing Kelly's state of mind. Indeed, we are unable to find any proof that Shuck knew that Kelly had approved the Stahl draft.

Early in April 1956, Gulf Coast distributed its Annual Report for 1955. This impressive-looking document contained numerous pictures, maps and graphs showing how well the company was doing in its gross monthly income, production, oil and gas reserves, total producing wells, and total new wells drilled annually. Among the statements made were: "Since December 1954 Gulf Coast Leaseholds has multiplied its daily gross oil production more than 22 times, nearly doubled its net oil and gas reserves, and increased its gross monthly income approximately 13 times"; "Total gross income for December 1955 amounted to $118,961, compared with $9,286 for the previous December"; "According to the appraisal of an independent evaluation engineer, net oil reserves including proved drilled, proved undrilled and probable proven reserves as of December 1955 amounted to 7,340,103 barrels. * * * Net oil reserves [one year ago] including proved undrilled and probable proven reserves, were 4,400,000." Under the heading "Earnings" was the following:

"While gross income and production both set new records for Gulf Coast Leaseholds in 1955, the Company was not able to report a net

profit for this period due to large expenditures during 1955 for the research, exploration and development of properties held by the Company which, however, effectively increased oil and gas reserves. These expenditures are expected to bring important long-range benefits to the Company through the discovery and exploitation of new producing properties, and the substantial increase of Gulf Coast Leaseholds' oil and gas reserves. The exploration and development of new properties are vital to the growth and continued success of any oil company, and Gulf Coast Leaseholds has been fortunate in the outstanding progress being made in this part of its expansion program."

Not only was "the Company not able to report a net profit" for 1955, it reported a net loss of $393,586. And this figure did not in any way reflect the fact that Gulf Coast had written down the value of its properties by more than $700,000 because the estimates of oil reserves in those lands had proven erroneous. This sizable writedown was in no way mentioned in the "prose" sections of the Annual Report or in the Statement of Profit and Loss. The writedown was relegated to the following entry near the bottom of the Statement of Paid-in Surplus and Deficit, the capital account:

"Adjustment for decrease in estimated oil reserves and condemnation of certain nonproducing leaseholds (Note 3) ........... 736,574."

Note 3 to the financial statements, with the heading "Property and Equipment," first discussed various acquisitions made by Gulf Coast during 1954 and 1955 and then got to "the drastic reduction in estimated commercially recoverable oil" which necessitated the writedown of properties. Within a week after the Annual Report was issued, the price of Gulf Coast decreased from almost $14 per share to $12.25.

On April 18, 1956, just after the release of the Annual Report for 1955, Kelly testified at a hearing of the Securi-

ties and Exchange Commission held in the Commission's New York office. During the course of his testimony, which ran for about 75 minutes, Kelly outlined the background of the September 30, 1954 agreement with Brandel Trust. The gist of Kelly's testimony was: that Gulf Coast was in a bad financial position during the Summer of 1954 and through Muriel Bailey, the customers' woman at Walston & Co., Kelly and Hagen met Van Allen and executed the September 30 agreement; that Kelly was responsible for inserting the provision to the effect that the September 30 agreement constituted a private placement and that his only assurance that Van Allen would comply with this provision was Van Allen's signature; that Kelly made attempts in the United States to determine the identity of the participants in Brandel Trust and went to Switzerland in October or early November for the purpose of evaluating Brandel's financial ability to meet its commitments; that the shares were issued in the name of MacDonald & Co. because Van Allen said red-tape would be involved were the shares issued in the name of Brandel Trust; that Kelly first learned that MacDonald & Co. was selling the shares during October 1954 and that he met with Burnside, Brandel's adviser, who said Brandel had the right to resell and would sue if Gulf Coast discontinued the stock shipments and that Kelly wrote Hagenbach, Brandel's president, about the resales but never got any response; that Kelly visited the office of the General Counsel of the SEC during October 1954 and was told that the SEC would not issue a formal opinion unless formal proceedings before it were instituted and that Kelly declined to commence such proceedings; that he subsequently had a short conference with Tait at the SEC and Burnside also visited the SEC in Washington; and that all the stock deliveries and payments under the September 30 agreement had been completed.

Kelly also testified that he had never seen any opinion letters by Burnside or Foley and throughout his testimony Kelly insisted that he was "rather ignorant" about the federal securities laws. Kelly also revealed that in April 1955 Gulf Coast and Brandel executed another sales contract involving bearer debentures with restrictive legends and that none of the debentures had been converted. Kelly thought that he owned about 30,000 shares of Gulf Coast on September 30, 1954 and about 20,000 on the day he was testifying. Finally, Kelly stated that neither he nor Hagen had ever talked with anyone from Shuck & Co. and neither he nor Hagen "even know who they are."

Two weeks later, on May 3, 1956, Hagen testified at an SEC hearing in New York. Hagen's attorney at this session was Kelly and the testimony lasted just over one hour. Hagen also described the negotiations leading up to the September 30 agreement and testified that he had no way of knowing whether Brandel was transferring stock in violation of the agreement, that he made no inquiries about any such activity, and that it was Kelly's function as Gulf Coast's chief counsel to keep abreast of these problems. Hagen denied that he had ever paid any securities firms to tout Gulf Coast stock, although he stated that in November 1954 Gulf Coast received numerous requests for information from various brokers, and specifically denied ever communicating with DuVal about Gulf Coast; according to Hagen, Gulf Coast did furnish information to Singer, Bean & Mackie.

During the latter part of April 1956, the market price of Gulf Coast Leaseholds continued to decline to about $10.50 per share. On April 30, 1956, Hagenbach, the Swiss attorney who was president of Brandel Trust and who had been urging European investors to buy Gulf Coast, communicated his great concern about Gulf Coast's reported loss during 1955 of "$1,300,000." Hagen responded on May 9, 1956, pointing out that the operating loss as indicated by the Annual Report was actually $328,000 and "such a figure is the result of certain accounting practices used by oil companies in the

United States." Hagen went on to say, "we must at all times take into consideration the prevailing income tax situation as it affects United States corporations. * * * Actually, computing it from a cash-in and cash-out standpoint, the Company came out on the plus side and we, as oil men, do not feel too badly about this situation." Hagen also said how the same thing had happened with companies like Superior Oil, and provided Hagenbach with various figures to show that things looked pretty good back at Gulf Coast Leaseholds. Hagen also enclosed a news clipping taken from the April 23, 1956 edition of the Tulsa Daily World which wrote a story about Gulf Coast's 1955 Annual Report under the headline: "FIRM SCORES NEW RECORDS."

At Kelly's urging, the Gulf Coast office wrote a letter to all its stockholders on May 15, 1956. The letter began:

"At Gulf Coast Leaseholds' annual meeting on May 2, 1956, company officers presented a most encouraging report of company activities and conditions at the end of the first quarter of 1956. This information is repeated here for the benefit of those stockholders who were unable to attend the annual meeting to hear the report in person."

The letter then discussed the "marked advance" in operating income and production and stated that the "profit and loss picture is most encouraging" and that the Gulf Coast officers "predicted that the report for the second quarter of 1956 would show Gulf Coast Leaseholds to be operating in the black."

We have previously indicated that in February 1956 Shuck and Van Allen effected their reconciliation. During the Summer of 1956, Van Allen and Shuck had a dispute about the payments to be made under their cash under-the-table arrangement. According to Van Allen Shuck thought that Van Allen owed him $40,000 while Van Allen insisted that he had overpaid Shuck by $80,000. It was agreed that the matter would be resolved by the accountants working for Shuck and Van Allen. When the accountants reported, it appeared that Van Allen owed Shuck "about $120,000."

Shuck was not the only one reaping huge profits from the distribution of Gulf Coast Leaseholds stock. Federal income tax returns filed by Hagen reveal that he reported sales of 95,000 shares of Gulf Coast Leaseholds during 1955 at a total profit of $414,000. According to Hagen's tax return for 1956, he sold 25,400 shares during that year at a profit of $129,000. Kelly's tax returns reveal that he sold about 49,000 shares during 1955 at a profit of $206,000, and just over 19,000 shares during 1956 at a profit of $64,000. Furthermore, the Government contended that the kickbacks by Van Allen to Hagen and Kelly, which were not reflected on their tax returns, constituted an additional source of substantial funds.

The collapse came when the price of Gulf Coast stock collapsed. By November 1, 1956 the stock had fallen to $5.50. At the end of 1956 Shuck discontinued his operations. By the middle of December 1956 the market for Gulf Coast was $3.75 and by December 16, 1957 it was selling at 87½ cents a share. In the meantime, Stahl, Miles & Co., Ltd. had foreclosed on Van Allen's debentures and they were bought in by none other than Kelly and Hagen. As usual when a conspiracy comes to an end the participants are at each other's throats.

The foregoing elaborate and seemingly over-long review of the evidence is absolutely indispensable as a background to consideration of questions concerning Shuck's motion for a severance, his claim of error in the receiving into evidence of certain administrative testimony of Kelly and Hagen before the SEC and the Attorney General of the State of New York, which we are about to describe, and his claims that the evidence as a whole was insufficient to connect him with the alleged single, over-all conspiracy or to warrant submission of the substantive fraud counts to the jury. A good part of this post-conspiracy administrative testimony given in 1957 and 1958 and one of the exhibits was devoted to the excoriation of Shuck for making false and misleading

statements about Gulf Coast. None of this was admissible against Shuck, the case against Kelly and Hagen, as we have already shown, was abundantly established without it, but, nevertheless the trial judge received this prior testimony and the exhibit, with a mild cautionary instruction to the jury. So much, then, for preliminaries.

### III

### *The Conspiracy Count*

First we address ourselves to the Conspiracy Count because we think a careful analysis of the allegations of the indictment, the proofs and the instructions to the jury with relation to the Conspiracy Count will greatly simplify the ensuing discussion of the many points argued by counsel for a reversal of the judgment of conviction against Kelly, Hagen and Shuck.

It is interesting to notice the various phrases used by the prosecution to describe "the conspiracy" alleged in Count 1 of the indictment. In Government Request No. 12, which was adopted by the trial judge in his charge to the jury, it is said "the indictment charges that the conspiracy had the objective of selling Gulf Coast Leaseholds stock to the public without disclosure of the true condition of the company, as required by the registration provision of the Securities Act, and by means of fraud, as prohibited by the Securities Act, and Mail and Wire Fraud statutes." This just about hits the nail on the head. In Request No. 18, also charged by the trial judge, the conspiracy is referred to merely as one "to sell Gulf Coast stock in violation of the law." There are various references in the requests submitted by the prosecution and adopted by the trial judge to "the unlawful purposes of the alleged conspiracy." There are also numerous references to "the objective of the conspiracy." And, on the subject of "Single or Multiple Conspiracies," Request No. 24, the Government's contention is that the evidence establishes basically "a central plan to effect the issuance and sale of * * * grossly overpriced unregistered

corporate securities to an uninformed and deluded investing public," quoting from Judge Smith's opinion in United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 944–945, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523.

We are told in the Government brief that the "nub of the offense" charged in Count 1 "was the public distribution of millions of dollars worth of Gulf Coast Leaseholds, Inc. stock, by means of fraudulent techniques designed to generate an unwarranted demand for the stock which would enable the defendants to sell at an unreasonably high price," and that the "public distribution took place in two stages," which were "interdependent."

What the proofs revealed, as we have seen, was a conspiracy of many persons, with Van Allen, Kelly and Hagen as a nucleus, to distribute 750,000 shares of unregistered Gulf Coast Leaseholds stock and to boost the market price of the stock by a series of maneuvers that constituted a fraudulent manipulation of the market. The idea of not merely selling and distributing the stock at prices far beyond what any reasonable person acquainted with the facts would consider its real value, but also persuading the purchasers to hold the stock until the time restriction on the debentures had expired, did not come into existence until November 1955, when the plan to register the debentures was abandoned and they were stamped with the legend forbidding the resale, assignment or conversion of the debentures before November 1956. It was about the time when this limitation was placed upon the disposition of the debentures that Van Allen turned to Shuck to help him keep up the price of the stock so it would be high enough in November 1956 to permit the expected and hoped for profit, which was the equivalent of the amount at which debenture stock could be sold at a price in excess of $8 per share, the conversion rate.

The first observation we shall make, and one which, we think, eliminates a number of problems from this

case, is that as to Kelly and Hagen the jury was unquestionably entitled to find that they, together with Van Allen and others, were participants in a single, over-all conspiracy as alleged in the indictment. However broadly or however narrowly the allegations are construed, it is clear that a finding was justified, if not compelled, to the effect that as to Kelly, Hagen and Van Allen the two stages were part of a single, over-all conspiracy to defraud the public by the distribution of Gulf Coast Leaseholds stock at grossly inflated prices.

 It is well settled that certain defendants in multi-faceted conspiracy cases can be so enmeshed in an illegal scheme as to make it quite unnecessary to inquire into the methods through which the original scheme developed and proliferated as to them. United States v. Benjamin, 2 Cir., 1964, 328 F.2d 854, 864, cert. denied sub nom. Howard v. United States, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497; United States v. Falcone, 2 Cir., 1940, 109 F.2d 579, affirmed, 311 U.S. 205, 61 S.Ct. 204, 85 L. Ed. 128; United States v. Aviles, 2 Cir., 1960, 274 F.2d 179, 187–190, cert. denied sub nom. Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009; United States v. Bentvena, 2 Cir., 1963, 319 F.2d 916, 926–929, cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271.

But Shuck is in a different position, and the failure of the trial judge to recognize this difference and to take the necessary steps to protect Shuck's rights makes it necessary for us to reverse the judgment of conviction against Shuck, on the substantive counts as well as the conspiracy count, and to remand the case for a retrial as to him. The classic rule to be applied in these joint conspiracy trials was stated by Mr. Justice Rutledge in Blumenthal v. United States, 1947, 332 U.S. 539, 559–560, 68 S.Ct. 248, 92 L.Ed. 154, to the effect that each defendant is to be protected and the obvious dangers

to each minimized by "clear rulings on admissibility, limitations of the bearing of evidence as against particular individuals, and adequate instructions," and, he added, "It is therefore extremely important that those safeguards be made as impregnable as possible."

While there was evidence from which the jury might have inferred that Shuck together with Van Allen, the salesmen in Shuck's office and perhaps others conspired to undertake a pressure campaign, or "boiler room" operation to induce individual investors to buy Gulf Coast Leaseholds stock at inflated prices and hold it, the proof supporting participation by Shuck in the single, over-all conspiracy alleged in the indictment is tenuous and unsubstantial. He knew nothing about the sale of the 750,000 shares of unregistered stock or the backing and filling over the debentures and their sale to Brandel Trust. Van Allen testified he did not tell Shuck that he was paying Singer, Bean & Mackie to buy Gulf Coast Leaseholds stock as it came on the market and that this was a very substantial part of the stock Shuck was to sell to the public. Moreover, the evidence that Shuck knew the information he was giving out was false is indirect and rests in good part upon the credibility of Teller, except for the post-conspiracy testimony of Kelly and Hagen before the SEC and the Attorney General of the State of New York, and the letter from Kelly to Shuck concerning Clint Murchison, and this evidence was plainly inadmissible as against Shuck.

What were the safeguards for the protection of Shuck that the trial judge should have applied and made "impregnable"? One not mentioned by Mr. Justice Rutledge in Blumenthal, but which is peculiarly applicable in this case was the granting of a severance as to Shuck the moment it appeared that he was likely to be prejudiced by the accumulation of evidence of wrongdoing by his co-defendants.[6] Another was by making clear

---

6. Rule 14 of the Federal Rules of Criminal Procedure, which deals with prejudicial joinder, provides as follows:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an in-

in the instructions to the jury that the proofs against Shuck were different from the proofs against Kelly and Hagen, pointing out what the difference was, as we have just done in a few sentences, and making sure that Shuck was given separate and individual attention as distinct from Kelly and Hagen. A third safeguard was, by interim instructions and by positive and clear instructions at the close of the case, to give Shuck every possible protection against the use of prejudicial and inadmissible testimony and exhibits. None of these safeguards was made "impregnable" and the most effective of them appears to have been completely disregarded.

■ In a case such as this one it was particularly important that the proofs be marshalled in such fashion as to place clearly before the jury the difference between the evidence against Kelly and Hagen and the evidence against Shuck on the single, over-all conspiracy phase of the case. See also United States v. Marchisio, 2 Cir., 1965, 344 F.2d 653, 666; United States v. Agueci, 2 Cir., 1962, 310 F.2d 817, 829, 99 A.L.R.2d 478, cert. denied sub nom. Guippone v. United States, 1963, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11; United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 330, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L. Ed.2d 50. The trial judge should not have agreed to the request by counsel that this marshalling of the evidence be omitted. But cf. United States v. Kahaner, 2 Cir., 1963, 317 F.2d 459, 479–480 & n. 12, cert. denied, Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65. But, if this were all, we should probably find it difficult to ascribe as reversible error acquiescence in an urgent request participated in by the prosecutor as well as by counsel for all defendants. Cf. United States v. Giuliano, 2 Cir., 1965, 348 F.2d 217. But one thing leads to another, and the failure to marshal the proofs probably led

the trial court to an error so vital and so prejudicial to Shuck as to require reversal, despite the fact that the error was not noticed or excepted to by counsel for Shuck. By his failure to realize that the state of the proofs was such as to justify the jury in finding that Kelly and Hagen were participants in the single over-all conspiracy but that Shuck was not, the trial judge lumped them all together and gave the "all or nothing" charge condemned by Judge Friendly in United States v. Borelli, 2 Cir., 1964, 336 F.2d 376, 384–386 & n. 4, cert. denied sub nom. Cinquegrano v. United States, 1965, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555. Thus, in this case, the trial judge instructed the jury:

> "In analyzing the evidence you must determine whether there was a single, continuing overall conspiracy or separate, independent conspiracies with separate and distinct groups involved, with no overall central purpose. If you find separate conspiracies and that some of the defendants belonged to one and not to the other, then there would be no proof of the single conspiracy charged in the indictment; and in that case you must return a verdict of not guilty as to all of the defendants on the conspiracy count."

See also United States v. Bentvena, 2 Cir., 1963, 319 F.2d 916, 938–940, cert. denied sub nom. Ormento v. United States, 375, U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271.

This was the equivalent of an instruction that the jury could not acquit Shuck on the conspiracy count without also acquitting Kelly and Hagen. Nothing could have been more helpful to Kelly and Hagen, who naturally do not raise the point here, and, by the same token, nothing could have been more prejudicial to Shuck. As noted in Borelli, 336 F.2d at pages 382–383, as we interpret the holding, this error is of such grave consequence to Shuck as to fall into the category of "plain error" to be taken into

dictment or information or by such joinder for trial together, the court may order an election or separate trials

of counts, grant a severance of defendants or provide whatever other relief justice requires."

consideration even if not noted by counsel at the trial. However, it is only fair to the trial judge to say that, had Judge Friendly's opinion in Borelli been filed and thus brought to the attention of the trial judge prior to the commencement of the trial of this case the "all-or-nothing" instruction would not have been given. Furthermore, lest the matter be left in any doubt, we hold that the "all-or-nothing" instruction in this case was "plain error" requiring reversal even in the absence of objection at the trial. Fed.Rules Crim.Pro., 52(b).

■ But this is not all. It is incomprehensible to us that the prosecutor should have taken the risk of offering into evidence parts of the Kelly and Hagen post-conspiracy testimony before the SEC and the Attorney General of the State of New York and the Kelly letter to Shuck, which charged Shuck with giving out false information about Gulf Coast Leaseholds and in no uncertain terms told him to stop. This administrative testimony was clearly inadmissible hearsay as against Shuck and it was persuasive and relevant to one of the critical issues in the case vis-a-vis Shuck, namely his knowledge that the representations he was making to investors were false. This testimony and particularly the letter about Shuck's references to Murchison, was referred to in the summation of the prosecutor and was sent with other exhibits into the juryroom at the request of the jury during their final deliberations.[7] Nor was this line of proof confined to a

few sentences or a single exhibit. Page after page of the testimony of Kelly and Hagen excoriated Shuck for his fraudulent misrepresentations. To say that all this was relevant to prove that Kelly and Hagen knew about the true condition of Gulf Coast Leaseholds strains our credulity. See also United States v. Gordon, 7 Cir., 1958, 253 F.2d 177, 182–183. The record is replete with other evidence of such knowledge on the part of Kelly and Hagen.

Moreover, there was such a volume of such proof, and it was so clearly not necessary to the Government case against Kelly and Hagen, that we are constrained to hold that no amount of cautionary instructions could have undone the harm to Shuck. Cf. United States v. Re, 2 Cir., 1964, 336 F.2d 306, 316–317, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177. As a matter of fact, the instructions as given were mild and ineffectual. Cf. Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278. Surely they were not such as to constitute an "impregnable" barrier against the use of this testimonial and documentary evidence to the prejudice of Shuck. See also United States v. Cianchetti, 2 Cir., 1963, 315 F.2d 584, 589–591; United States v. Aviles, 2 Cir., 1960, 274 F.2d 179, 193 & n. 4, cert. denied sub nom. Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L. Ed.2d 1009.

■■ Even this is not all. Before trial and on numerous occasions during the trial counsel for Shuck moved for a

---

7. The letter read as follows:

"March 10, 1956

M. J. Shuck Company
39 Broadway
New York 6, New York
Gentlemen:

Mr. Clint W. Murchison has called to my attention a recent release which your company made on Gulf Coast Leaseholds, Inc. I do want you to know that we are pleased that your firm has an interest in the company.

However, we feel that the statements made concerning Mr. Clint W. Murchison should not have been made. Mr. Murchison does not own any stock in the company. Mr. Murchison is not con-

nected with the management and any interests in development wells which he may have are handled through some companies which he either owns or controls and through his relationship with some of the officers of the company. Literature such as this can only damage the relationship and we hope that there will be no further connection of his name with the company. In fact, we would appreciate it if any literature which you distribute would be checked with us for accuracy before sending it out.

Again let me thank you for your interest in the company.

Very truly yours,
Roy B. Kelly"

severance of the case as against him. It is well settled that the trial judge is under "a continuing duty at all stages of the trial to grant a severance if prejudice" to a particular defendant is made manifest. Schaffer v. United States, 1960, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921. While there would seem to have been nothing in the papers submitted or the arguments advanced when the trial commenced to justify a holding by us that the denial of Shuck's motion for a severance was an abuse of judicial discretion, still, as the trial dragged on far beyond the two or three months estimate given to the jurors as they were being selected, the prejudice to Shuck became more and more apparent with each passing day. Not only was his presence in court required for three months or more before his name was even mentioned, but his illness and inability to be present caused several adjournments that were most unwelcome to the jurors and his straitened finances caused delays over the selection of new counsel. There were complaints by some of the jurors about the length of time consumed and one juror, who was finally excused, made it clear that he blamed the delay on "the defendants," which naturally included Shuck, as his illness might have been regarded as malingering.

The principal and inevitable prejudice, however, was caused by the slow but inexorable accumulation of evidence of fraudulent practices by Shuck's co-defendants Kelly and Hagen. The ingenious schemes and designs they formulated to cover their tracks as well as the shameless way in which they manipulated the market, thumbed their noses at the SEC and feathered their nests at the public expense, concealing their ill-gained payoffs by means of organizations formed under the secrecy laws of Liechtenstein and Switzerland, must have stamped them in the eyes of the jurors as unscrupulous swindlers of the first rank. That some of this rubbed off on Shuck we cannot doubt.

When this accumulation reached its peak in the offer into evidence of the administrative testimony of Kelly and Hagen and the letter by Kelly connected therewith, and this testimony and the letter were received in evidence, it is clear to us that the motion then made by counsel for Shuck for a severance should have been granted. It was an abuse of judicial discretion to deny the motion for a severance at that time.[8]

We now turn to the mass of exceptions taken by Kelly and Hagen to various portions of the trial judge's charge and to the denial of requests to charge, on the general subject of the conspiracy count. Kelly and Hagen submitted 125 requests for instructions. We have seldom, if ever, seen such a hodgepodge. Plainly erroneous statements of law, assumptions of facts in issue, argumentative matter and ambiguities are intermingled with an occasional accurate statement of law. A few of these were flatly denied; most of them were "denied except as charged."

With respect to the instructions and requests as a whole, it may be well to repeat one or two generally accepted federal rulings that counsel frequently seem to have forgotten or to have overlooked. The first is that it is not the function of the trial judge to put lengthy, confusing or inaccurate requests for instructions through a winnowing or sifting process in an endeavor to select what is good and reject what is bad. If a proffered request is in any respect incorrect, the denial of such a request is not error. Aeby v. United States, 5 Cir., 1953, 206 F.2d 296, 299–330, cert. denied, 346 U.S. 885, 74 S.Ct. 136, 98 L.Ed. 390; Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, 745, cert. denied sub nom. Palermo v. United States, 1964, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498; Grandsinger v. United States, 10 Cir., 1964, 332 F.2d 80; Lash v. United States, 1 Cir., 1955, 221 F.2d 237, 240–241, cert.

8. See Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557· Schaffer v. United States, 5 Cir., 1955, 221 F.2d 17, 19, 54 A.L.R.2d 820; Note, 74 Yale L.J. 553 (1965); Note, 57 Colum. L.Rev. 387 (1957).

denied, 350 U.S. 826, 76 S.Ct. 55, 100 L.Ed. 738; United States v. Groopman, 2 Cir., 1945, 147 F.2d 782, 785, cert. denied, 326 U.S. 745, 66 S.Ct. 29, 90 L.Ed. 445; Huff v. United States, 5 Cir., 1962, 301 F.2d 760, 768, cert. denied, 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230. The second is that, if the trial judge has included in his charge-in-chief accurate instructions covering this or that phase of the case, it is not error to refuse to repeat substantially the same or a different statement of the same principles of law in the language submitted by counsel. United States v. Press, 2 Cir., 1964, 336 F.2d 1003, 1015, cert. denied, 1965, 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559; United States v. Haskell, 2 Cir., 1964, 327 F.2d 281, 286, cert. denied, 377 U.S. 945, 84 S.Ct. 1351, 12 L.Ed.2d 307; United States v. Gaydos, 2 Cir., 1962, 310 F.2d 883; Windisch v. United States, 5 Cir., 1961, 295 F.2d 531; Bary v. United States, 10 Cir., 1961, 292 F.2d 53, 59; Dranow v. United States, 8 Cir., 1962, 307 F.2d 545, 568–570; Sanseverino v. United States, 10 Cir., 1963, 321 F.2d 714.

On the conspiracy count the instructions as given are unexceptionable as far as Hagen and Kelly are concerned. These cover a description of what a conspiracy is, how its existence is to be determined, the method to be pursued by the jury in deciding whether or not the defendants and each of them joined the conspiracy, a cautionary statement on the use of acts and statements in furtherance of the conspiracy, and allied matters. That the prosecutor submitted these instructions in the language adopted by courts generally, and that the trial judge gave them, after checking over the cases cited to support them, is not strange. Accordingly, we hold there was no error in the instructions as given on the subject of the conspiracy count and we find no prejudicial error in the denial of any of the requests submitted by Kelly and Hagen on this subject.

 At this point we may as well dispose of a few other contentions advanced by counsel for Kelly and Hagen in relation to the main charge to the jury and to requests for instructions submitted by Kelly and Hagen. In a case in which no inconsiderable portion of the trial transcript is devoted to almost incessant and repetitive argument by counsel for Kelly and counsel for Hagen, often despite statements by the trial judge to the effect that he had already ruled or made up his mind and desired no further oral argument, it is surprising to find in the Kelly and Hagen briefs various claims for reversal because they were refused the opportunity to argue their points orally and that for this reason the constitutional rights of Kelly and Hagen had been infringed by the denial of procedural due process. Much of this discussion is addressed to the alleged cutting off of oral argument in connection with the rulings on requests and on exceptions to the final instructions to the jury. We have examined the record with care and find that at one place or another each and every one of the points of counsel were sufficiently stated to advise the trial judge of precisely how counsel desired the trial judge to rule on each of the questions discussed in the briefs. Indeed, we marvel at the patience of Judge Cashin as, under the guise of excepting to portions of the instructions as actually given, counsel for Kelly and counsel for Hagen took turns arguing the sufficiency and validity of the requests they had previously submitted and which had already been denied. It was in vain that Judge Cashin reminded counsel that the jury was waiting to commence deliberations on the verdict, that he had already passed on the requests, and that he wished counsel to confine their remarks to pointing out alleged errors in the instructions he had just given to the jury.

 Another little point that is evidently thrown in for good measure is that the trial judge "promised" to grant parts of the Kelly and Hagen requests but later changed his mind and that this and other rulings amounted to a refusal to comply with Rule 30 of the Federal Rules of Criminal Procedure and impaired the ability of counsel to make a proper summation to the jury on behalf

of Kelly and Hagen. In different phraseology various phases of this same theme are adverted to here and there in the Kelly and Hagen briefs. Counsel for Kelly and Hagen point to a part of the lengthy colloquies at the time the requests of all parties were under discussion. The trial judge said "yes" in answer to a question by counsel as to whether "denied except as charged" meant that the request would be granted "in substance but not in the precise language submitted." Counsel interpret this as a promise to cover all the "subjects" included in the requests. The probability is that the trial judge intended his answer to be applicable to the request on the subject of reasonable doubt only. In any event, we think the most he could have intended to say was that the parts of these requests that seemed proper to him would be included in his final instructions but not in the precise language submitted by counsel. See also Windisch v. United States, 5 Cir., 1961, 295 F.2d 531, 533. And that is what the trial judge did. By way of summary, we find no prejudicial error in any of the instructions as given and no prejudicial error in the refusal to grant any of the requests for instructions submitted on behalf of Kelly and Hagen. Moreover, we think the instructions adequately covered all the issues and the law applicable thereto that can fairly be said to be relevant to the performance by the jury of its function of passing upon the guilt or innocence of Kelly and Hagen on the conspiracy and registration counts. We shall, nevertheless, discuss later several of the arguments of Kelly and Hagen addressed to the correctness and sufficiency of the instructions on specific subjects.

## IV

### *The Claims of Misconduct by the Trial Judge Are Wholly Unjustified*

Vitriolic attacks upon the fairness and impartiality of the trial judge seem to have become commonplace in these criminal conspiracy cases. See United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 330, 332, cert. denied, 379 U.S.

845, 85 S.Ct. 50, 13 L.Ed.2d 50; United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 943–944, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523. Perhaps counsel who do not practice in the Second Circuit yield to the temptation to indulge in this sort of thing more often than others. In this case not a single one of the claims of misconduct by the trial judge finds a shred of justification in the record. To make matters worse we find repeated instances of impertinence, churlishness, discourtesy and lack of respect for the dignity of the court, principally by counsel for Kelly, that we cannot permit to pass without comment. It is bad enough when counsel for a defendant with a weak case turns his guns on the prosecutor, similar unfounded action against the judge presiding over the trial is not to be tolerated. See also Dranow v. United States, 8 Cir., 1962, 307 F.2d 545, 549–550, 571–572.

The instructions in chief are not "a carbon copy of the Government's requests to charge," nor did the trial judge say "Amen" to every contention by the prosecutor, as charged. In many instances the wording of certain requests was altered substantially. In numerous instances material in the instructions emanated from the trial judge himself. Indeed, the prosecutor and his associates are to be commended for preparing with such care and diligence the requests that were submitted on behalf of the Government. The preparation for the trial of this intricate case and the presentation of the proofs was an arduous task, as the investigation covered a wide field including distant parts of the United States and several foreign countries. We commend the prosecutor Arthur L. Liman and his associates for a task well done, particularly as it required the plugging of every hole through which Kelly and Hagen might escape from the just punishment that now awaits them. Surely we cannot be expected to reverse because the prosecutor formulated numerous requests for instructions with such skill and with such regard for the law as laid down in prior

cases that these accurate and proper statements were adopted by the trial judge.

▮ Some of the claims of misconduct require a somewhat detailed statement and a brief discussion.

On January 3, 1963, some three months after the trial commenced, Milton R. Wessel, Esq., counsel for the defendant Jules Bean, who had not yet pleaded guilty, had occasion to go to the bench at the end of the court day, to speak to the trial judge on a wholly unrelated matter having no connection whatever with the case on trial. While the conversation was not reported, Mr. Wessel informed counsel for Kelly and Hagen that after the discussion of the unrelated matter was concluded, the trial judge made a comment that he requested Mr. Wessel to communicate to counsel for Kelly, Hagen and Shuck. The purport of this was, according to Mr. Wessel's memorandum:

"He said he could not * * * understand why Kelly, Hagen and Shuck were fighting all the way. He said that every bit of evidence that came in added another 'nail in their coffin,' referring to Kelly and Hagen * * *.

"He said that I should tell them that he was being placed in a position which he did not want, because if the jury returned a verdict of conviction, he might well conclude that he had to sentence them to prison, even including Kelly."

In view of our reversal of the judgment of conviction against Shuck we find no occasion to discuss any further reference to him.

While it is said that "counsel understands the essential good intentions" of the trial judge, and the suggestion is called a "compassionate" one, the immediate result was a motion for the following relief, based on the statement which was made to Mr. Wessel: (a) an immediate judgment of acquittal as to Kelly and Hagen; (b) the disqualification of the judge to continue to preside over the trial; (c) a severance of the case against Kelly and Hagen; (d) a mistrial; (e) a transfer of the case to another district or the direction of a trial later "by a visiting judge." It is charged that the trial judge indicated he had a firm conviction that Kelly and Hagen were guilty as charged and that he was therefore automatically disqualified, that the "proceeding," as the conversation with Mr. Wessel is called, was part of the trial and that it was not conducted in the presence of Kelly and Hagen and their counsel, in violation of the rights secured to them by the Sixth Amendment. The claims of counsel for Kelly and Hagen covered a wide spectrum and Mr. Wessel promptly protested that they had completely misinterpreted the tenor of the judge's statement. Although neither Kelly nor Hagen pleaded guilty as a result of the incident, and it is undisputed that no negotiations looking to guilty pleas were then under way, it is nevertheless characterized as a species of coercion. There is no merit in any of these contentions and reliance on United States v. Tateo, S.D.N.Y., 1963, 214 F. Supp. 560, is wholly misplaced.

While we may assume that it would have been better had the trial judge kept his "compassion" and his "good intentions" to himself, we think it clear that the conversation was in no sense a "proceeding," nor was it in any sense whatever a part of the trial. United States v. Gironda, 2 Cir., 1960, 283 F.2d 911, cert. denied, 1961, 365 U.S. 852, 81 S.Ct. 816, 5 L.Ed.2d 816; Stein v. United States, 9 Cir., 1962, 313 F.2d 518, cert. denied, 1963, 373 U.S. 918, 83 S.Ct. 1307, 10 L. Ed.2d 417; Cox v. United States, 8 Cir., 1962, 309 F.2d 614. We find nothing to indicate that the trial judge had decided in his own mind that Kelly and Hagen were guilty. Even if we were inclined to speculate on that subject, which we are not, the statement ascribed to the trial judge was not with respect to any views held by himself but what the reaction of the jury might be. After all, as the trial judge instructed the jury later, they were the sole judges of the guilt or innocence of the defendants, not he. In fact he told

the jury in so many words that he had no opinion on that subject. Moreover, contrary to the assertion of counsel, a mass of evidence had been received prior to January 3, 1963, all of which made things look bad for Kelly and Hagen. Without belaboring this point, our review of the record indicates that by January 3, 1963 it was perfectly clear that Kelly and Hagen knew that the investment pledge embodied in the September 30, 1954 agreement was a complete sham and it had been clearly demonstrated that they had actively participated in and materially facilitated the substantial public distribution of Gulf Coast Leaseholds stock.

 Another charge that the trial judge conducted an *ex parte* proceeding in the absence of Kelly and Hagen and their counsel in violation of the rights secured by the Sixth Amendment is based on an incident that occurred while the jurors were deliberating on their verdict. The jury sent in a note to the trial judge which read: "We should like to have the court's comment on the basis for the determination of intent and wilful participation." Counsel demanded that they be furnished a copy of the entire charge so they could select the portions of the charge they thought should be repeated to the jury. When this was denied they demanded the right to sit down with the trial judge and the court reporter and supervise or assist the judge in deciding what "comment" the trial judge would make. It all sounds like Alice in Wonderland. This presumptuous suggestion was rejected, and, over the vigorous protest of counsel for Kelly and Hagen the trial judge made his "comment," as requested by the jury, and in doing so he read from various pertinent parts of the instructions as already given. After a further statement of objections to the parts read by the trial judge and to his omission to read other parts, Judge Cashin quietly reminded counsel that the jury had asked only for his "comment," and he added, "That is all they asked for, and that is all they got, period." We agree with him.

## V
### *The So-Called "Slanted" Instructions*

The Kelly and Hagen briefs are filled with vague charges that the trial judge became an "advocate" for the prosecution, that the instructions were "inflammatory" and "no more than a closing argument in favor of the Government," that the instructions on such subjects as reasonable doubt and burden of proof were hidden away and buried in the instructions as a whole in such fashion as to make little impression upon the minds of the jurors, and that in other respects the trial judge was "partisan." These animadversions upon the performance of his judicial duties by the trial judge should never have been made. There is not a syllable of justification to be found in this massive record for any of these attacks. It is a cruel thing to resort to such innuendoes against a judge with a fine record of many years of faithful service on the federal bench, and who, by virtue of his office, cannot defend himself.

What counsel perhaps means by all this bombast is probably no more than this: in the course of time, prosecutors and defense counsel have culled out of thousands of instructions to juries certain particular phraseology that they think has a tendency, perhaps subconsciously, to influence jurors favorably to the prosecution or to the defense. As these particular instructions are mentioned again and again by appellate courts in affirming judgments where such instructions were objected to, it should not surprise us to find prosecutors who seek to have these particular instructions used in whole or in part on the ground that they have been "approved" by the courts. We think this is all counsel means by "slanted" instructions.

It so happens that there are a few portions of the instructions in this case that can fairly be said to come within the category just above defined. What the trial judge did is revealed by a careful study of the charge as a whole. He took the requests submitted by the parties, checked them carefully with what he read

in the cases cited to him in support of the requests and then changed some of them and used others in the form submitted. Two examples will suffice to dispose of the Kelly and Hagen argument about "slanted" instructions.

■ The Government Request on reasonable doubt is set forth in the margin [9] as a typical example of the "slanted" instruction dear to the hearts of prosecutors. It was used on the trial in United States v. Agueci, 2 Cir., 1962, 310 F.2d 817, 99 A.L.R.2d 478, cert. denied sub nom. Guippone v. United States, 1963, 372 U.S. 959, 83 S.Ct. 1013, 10 L. Ed.2d 11, and on the trial in United States v. Kahaner, 2 Cir., 1963, 317 F. 2d 459, cert. denied, Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L. Ed.2d 65, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65. Exercising his discretion, as he is supposed to do, Judge Cashin thought this language not appropriate for this case. So he prepared an instruction of his own which was more favorable to the defendants, as follows:

"There are no plainer words than the words 'reasonable doubt.' The term defines itself. You may, however, be aided by the idea of what a reasonable doubt is not. A reasonable doubt is not a mere possible doubt, nor a vague nor fanciful doubt. A mere conjecture or surmise is not a reasonable doubt. In this case a reasonable doubt of the defendants' guilt of the crimes charged by the United States of America is such a doubt thereof as a rational man or woman would consider well founded after full and fair deliberation upon all the credible and trustworthy evidence in this case; or, as has been stated, a doubt for which a reason can be given.

"Now, such a doubt in this case entitles the defendants to a verdict of not guilty. In consequence, the law is such that in a criminal case it is enough if proved that the defendants' guilt be established beyond a reasonable doubt, not beyond all possible doubt."

While counsel for Kelly and Hagen object to this, we find virtually nothing wrong with it. United States v. Accardi, 2 Cir., 1965, 342 F.2d 697, 699; United States v. Davis, 2 Cir., 1964, 328 F.2d 864; cf. United States v. Johnson, 2 Cir., 1965, 343 F.2d 5.

■ By way of contrast, the Government Request on the subject of the character proof elicited from some of the Government witnesses by Hagen's counsel as part of Hagen's defense was used

---

9. "The Government has the burden of proving the charges against each defendant beyond a reasonable doubt. It is a burden that never shifts and remains upon the Government throughout the entire trial. A defendant does not have to prove his innocence. On the contrary, he is presumed to be innocent of the accusations contained in the indictment.

This presumption is removed only if and when you are satisfied that the Government has sustained its burden of proving the guilt of a defendant beyond a reasonable doubt.

You may well ask what is meant by the expression 'Beyond a reasonable doubt.' I believe the words themselves give the answer. It is a doubt based on reason, which arises from the evidence or absence of evidence. It is a doubt which a reasonable man or woman might entertain. It is not a fanciful doubt.

It is not an imagined doubt. It is not a doubt that a juror might conjure up in order to avoid performing an unpleasant task or duty. Let us repeat, it is a reasonable doubt. The burden is on the Government to establish the guilt of the defendants beyond a reasonable doubt.

It is not necessary for the Government to prove the guilt of the defendants beyond a possible doubt. If that were the rule, few man or women, however guilty they might be, would be convicted. The reason is that in this world of ours it is practically impossible for a person to be absolutely and completely convinced of any controverted fact which by its nature is not susceptible of mathematical certainty. In consequence, the law is such that in a criminal case it is enough if proof that a defendant is guilty be established beyond a reasonable doubt, not beyond all possible doubt."

without change. It also was used in United States v. Kahaner, supra, 317 F.2d 459, cert. denied, Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65, and reads as follows:

"During the course of the trial, several witnesses called by the Government testified on cross-examination that defendant Hagen had a good reputation in his community. You should consider this evidence together with all the other evidence in determining his guilt or innocence. Evidence of good reputation may, in itself, create a reasonable doubt where without such evidence no reasonable doubt would exist. But if, from all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty, a showing that he previously enjoyed the reputation of good character does not justify or excuse the offense, and you should not acquit him merely because you believe he has been a person of good repute."

This is supposed to be "slanted." Cf. United States v. Birnbaum, 2 Cir., 1964, 337 F.2d 490, 498–499, with United States v. Kabot, 2 Cir., 1961, 295 F.2d 848, 855 & n. 1, cert. denied, 1962, 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550, and United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 947–948 & n. 28, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523. See also United States v. Haskell, 2 Cir., 1964, 327 F.2d 281, 286, cert. denied, 377 U.S. 945, 84 S.Ct. 1351, 12 L.Ed.2d 307. Whether or not it is "slanted," we think the exception taken to this instruction is not well founded under any of the cases above cited. The instruction is in all respects accurate and it correctly states the legal principle involved.

 Counsel suggests it is better for the trial judges to give what counsel describes as "standard" or "boiler plate" instructions on such subjects as burden of proof, the presumption of innocence, reasonable doubt and other matters constantly recurring in every criminal case. We think it better to leave the common law powers of the trial judge unfettered and unimpaired.

## VI
### The Reading of the Indictment to the Jury

██ ██ This was undoubtedly a mistake. Even in somewhat abbreviated form the reading of the indictment covered more than 50 pages of the trial transcript. It is idle to cite cases, as the Government does, for the general statement that it is discretionary with the trial judge to read or not to read the indictment to the jury in a criminal case. This indictment was too long, too detailed and too involved for us to suppose reading it would be helpful to the jury. The probabilities are that it merely bored the jurors as they waited for the trial judge to get down to business. In any event, the reading of the indictment was in no small measure due to the unfortunate acquiescence of the trial judge in the suggestion of all counsel that he omit any reference to the facts by way of marshalling the evidence. Moreover, the jurors were told in very plain words: "The indictment is simply an accusation and proves nothing." The trial judge also instructed the jury: "It is a cardinal principle of our system of justice that every person accused of crime is presumed to be innocent until his guilt is established by proof sufficient in law. The presumption protects the defendants here at every stage of this trial. That presumption follows this case as it goes to you. That presumption may be repelled or overthrown only by your verdict."

These instructions, by the way, and others on burden of proof, reasonable doubt and other important subjects were included in the early part of the charge, just before the reference to the statutory provisions the defendants were charged with violating and the reading of the indictment. These are the same instructions Kelly and Hagen would have us believe were "out of place," "out of

context," or hidden away so that no one would notice them.

We find no prejudicial error in the reading of the indictment.

## VII
### Accomplices and Co-conspirators Who Pleaded Guilty

The contentions of Kelly and Hagen on the general subject of accomplices and co-conspirators are many and varied. It may well be that, in the interval between the filing of the indictment on March 24, 1960 and the commencement of the trial on November 14, 1962, the prosecutor was trying his best, and with considerable success, to obtain the cooperation of many co-defendants. The result was: the cases against Paul Hagenbach, Brandel Trust, Charles R. Stahl, DePontet & Co., Adam Miles and Stahl, Miles & Co. were severed prior to trial; John Van Allen, Irving H. Hertzberg, F. W. MacDonald & Co., Pierre A. DuVal, Du Val's Consensus, Inc., Martin Teller and Michael Ackman pleaded guilty prior to trial; and Jules Bean pleaded guilty on February 7, 1963, after the trial had been going on for several months. Van Allen, Hertzberg, Teller, Hagenbach and Stahl were Government witnesses at the trial.

■ To begin with, it is futile for counsel to attempt to reargue in this Court questions of credibility that have already been decided by the jury. See, e. g., United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 325, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; United States v. Robbins, 2 Cir., 1965, 340 F.2d 684, 687; United States v. Mims, 7 Cir., 1965, 340 F.2d 851, cert. denied, 85 S.Ct. 1535; Proffit v. United States, 9 Cir., 1963, 316 F.2d 705; United States v. Moran, 2 Cir., 1945, 151 F.2d 661. But the temptation to "castigate" such former friends and associates seems to be too strong for any but the most able advocates to resist. It may well be that Van Allen is the worst of the lot, and that Teller has the best record for perjuring himself whenever it is to his advantage to do so. All this, however, is essentially irrelevant to our task of appraising alleged errors and the prejudicial effect thereof. Cf. United States v. De Dominicis, 2 Cir., 1964, 332 F.2d 207, 210. The same may be said of the internecine warfare during the trial between Kelly and Hagen, on the one hand, and Shuck on the other. Doubtless prosecutors always hope co-defendants will turn on one another and thus enhance the chances that all will be found guilty. This may be exasperating to counsel, but it is not unlikely that, when all is said and done, the ends of justice will be attained. See, e. g., United States v. Houlihan, 2 Cir., 1964, 332 F.2d 8, 15, cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed. 2d 37.

■ It is claimed by Kelly and Hagen, however, that "the tenacious refusal of the Court to impose sentence on Van Allen" before the conclusion of the trial constitutes reversible error. The theory seems to be that, if he was given a suspended sentence this would be proof positive in the eyes of the jurors that he was perjuring himself to earn his reward. We find no authority to support this claim of error. The uniform current of authority seems to place such matters entirely within the discretion of the trial judge. Barlow v. United States, 1 Cir., 1925, 6 F.2d 105; United States v. Pruitt, 4 Cir., 1965, 341 F.2d 700; Debardeleben v. United States, 9 Cir., 1962, 307 F.2d 362; Epperson v. Anderson, D. C.Cir., 1963, 326 F.2d 665; Bankey v. Sanford, D.C.Ga., 1947, 74 F.Supp. 756, affirmed, 5 Cir., 165 F.2d 788, cert. denied, 1948, 333 U.S. 847, 68 S.Ct. 649, 92 L.Ed. 1130; United States v. Grabina, 2 Cir., 1962, 309 F.2d 783, cert. denied, 1963, 374 U.S. 836, 83 S.Ct. 1885, 10 L.Ed.2d 1057; United States v. Tannuzzo, 2 Cir., 1949, 174 F.2d 177, cert. denied, 338 U.S. 815, 70 S.Ct. 38, 94 L.Ed 493. See also Leach v. United States, 1964, 118 U.S.App.D.C. 197, 334 F.2d 945. In this particular case there were many cogent reasons for waiting for the verdict and then sentencing all defendants together.

Nor was it error to permit a co-defendant, Jules Bean, to plead guilty during the progress of the trial. United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 948, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523; United States v. Aronson, 2 Cir., 1963, 319 F.2d 48, 52, cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164; United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 333, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; Koolish v. United States, 8 Cir., 1965, 340 F.2d 513, 529–531, cert. denied 1965, 85 S.Ct. 1805. It is to be noted, however, that in this case the guilty plea was not made in the presence of the jury, nor were the jurors in any way apprised of the fact it had been made. While the statement in Crosby, also quoted verbatim in the later cases above cited, goes on to say that there is no impropriety or error "even for the jury to be present when the pleas are entered," the writer of this opinion wishes to record his disagreement with this view. It may well be that the rule permitting such pleas to be entered in the full view of the jury, and even by pre-arrangement with the prosecutor and the trial judge, has been in force in this Circuit for many years. If so, it is time to change the rule. If, as and when, during the progress of a joint trial, a co-defendant pleads guilty, the entry of such a plea cannot possibly be beneficial to the interests of the other defendants. In the absence of some very exceptional circumstance, such as the giving way to a sudden impulse on the part of the individual pleading guilty, the dramatic and emotional features attendant upon the entry of the plea in the presence of the jurors should be avoided. In the natural course of events guilty pleas during joint trials are to be anticipated. At least they cannot be avoided. It is the plain duty of the presiding judge to do nothing to increase the possibility of prejudice to the remaining defendants.

Kelly and Hagen argue, however, that there was so much testimony against them by persons who were jointly charged as co-defendants and who had pleaded guilty before trial, as well as by accomplices and co-conspirators with criminal records, that it was necessary for the trial judge accurately to instruct the jury on the subject of the pleas and the other circumstances just referred to. We agree with this. The difficulty is that the trial judge did give a series of unexceptionable instructions on these matters and, as usual, the requests submitted by Kelly and Hagen were defective. For example, Kelly and Hagen submitted Request No. 54 on this subject. We cannot understand why they insist that the testimony of accomplices must be corroborated. The federal rule is clearly to the contrary. E. g., Caminetti v. United States, 1917, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442; United States v. Agueci, 2 Cir., 1962, 310 F.2d 817, 833, cert. denied sub nom. Guippone v. United States, 1963, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11; United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 272, cert. denied [Lessa v. U. S., Puco v. U. S., Teitelbaum v. U. S., Mirra v. U. S., Maimone v. U. S., Behrman v. U. S., De Saverio v. U. S., 361 U.S. 863, 80 S.Ct. 119, 123, 124, 130, 4 L.Ed.2d 102, 108]; Williamson v. United States, 5 Cir., 1964, 332 F.2d 123, 132; United States v. Vita, 2 Cir., 1961, 294 F.2d 524, 526, cert. denied, 1962, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed. 788; Williams v. United States, 9 Cir., 1962, 308 F.2d 664; United States v. Mule, 2 Cir., 1930, 45 F.2d 132; United States v. Gallo, 2 Cir., 1941, 123 F.2d 229. See generally 7 Wigmore, Evidence, Sections 2056–60 (3d ed. 1940).

Moreover, in a clear, specific and comprehensive series of instructions appearing at pages 17484–17491, inclusive, of the trial transcript the trial judge dealt with all the matters just above referred to. These instructions are well balanced, correct and they do full justice to all the defendants. Thus he said that the fact that certain defendants pleaded guilty "is no proof whatever of the guilt of these defendants who are on trial * * * their pleas of guilty may not be used by you in any way as evidence against or

unfavorable to any of the defendants on trial"; that Van Allen, Teller, Hertzberg, Hagenbach and Stahl were interested witnesses as matter of law, and that all the testimony of admitted perjurers "should be considered with caution and weighed with great care." He added:

"Consider whether or not a witness is interested in or concerned with receiving some reward or consideration or possible immunity against punishment or against prosecution for any offense or offenses with which the witness might be charged or has been charged. All evidence of a witness whose self-interest or attitude is shown to be such as might tend to prompt testimony unfavorable to the accused should be considered with caution and weighed with great care."

■ We find no error in any of the instructions relative to accomplices, to the guilty pleas of some co-defendants, to the criminal records of some of the Government witnesses and generally on the subject of the credibility of all witnesses.

## VIII
### Miscellaneous Claims of Violation of Constitutional Rights of Kelly and Hagen

### A

■ It is probably a sufficient answer to the contention by Kelly and Hagen that they were deprived of their right under the Sixth Amendment to a speedy trial to cite United States v. Lustman, 2 Cir., 1958, 258 F.2d 475, cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109, and the long line of cases in this Circuit following Lustman.[10] There was no delay after Kelly and Hagen took steps to bring the case to trial and, according to Lustman, the right to a speedy

trial "is deemed waived if not promptly asserted." As the writer of this opinion is of the view that the rule of Lustman is too inflexible and should be modified, cf. People v. Prosser, 1955, 309 N.Y. 353, 130 N.E.2d 891, 57 A.L.R.2d 295 (Fuld, J.); Marshall v. United States, D.C.Cir., 1964, 337 F.2d 119, we refer briefly to a few of the circumstances indicating that, at least in *this* case the circumstances clearly require the application of the Lustman rule. The case is extremely complicated, as sufficiently appears from the lengthy indictment, with its 20 named defendants, 28 co-conspirators and 160 counts, and the far-ranging character of the proofs described in our Review of the Evidence. The lapse of time from the filing of the indictment on March 24, 1960 to the commencement of the trial on November 14, 1962 was not excessive in view of the numerous motions made by the defendants. See United States v. Van Allen, S.D.N.Y., 1961, 28 F.R.D. 329, 1962, 208 F.Supp. 331. Once the bill of particulars was filed by the Government, Kelly and Hagen apparently lost their zeal for a speedy trial and further motions on other procedural matters were made. While there was delay in disposing of the original motions, some consideration must be given to the preoccupation of the court with other problems and the various complicated features of the case. In any event, it is evident that this delay did not prejudice Kelly and Hagen.

### B

■ It is claimed by Kelly and Hagen that their Fifth Amendment rights were infringed both by the failure to restrain Van Allen with respect to some of his unresponsive answers on cross-examination and by instructing the jury at the close of the case at the request of Shuck and over the objections of Kelly

10. United States v. Haller, 2 Cir., 1964, 333 F.2d 827, cert. denied, 379 U.S. 921, 85 S.Ct. 276, 13 L.Ed.2d 334; United States v. Van Allen, 2 Cir., 1961, 288 F.2d 825, cert. denied, 368 U.S. 836, 82 S.Ct. 31, 7 L.Ed.2d 37; United States v. Research Foundation, Inc., S.D.N.Y., 1957, 155 F.Supp. 650, 653–654; United States v. Patrisso, S.D.N.Y., 1958, 21 F.R.D. 363; Harlow v. United States, 5 Cir., 1962, 301 F.2d 361, 366–367, cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed. 2d 56.

and Hagen, to the effect "no presumption or inference of any kind" against the defendants or any of them was to arise out of their failure "to take the witness stand and to testify" in their own defense, "and you must not permit that fact to weigh in the slightest degree against him or any of them, nor should this fact enter into your deliberations or discussions in any manner."

With respect to the Fifth Amendment instructions we think they are unexceptionable, that, after Shuck's request the trial judge had no alternative other than to give these instructions, and that it would not have been error for him to give them even if Shuck had not made the request. Bruno v. United States, 1939, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; United States v. Garguilo, 2 Cir., 1962, 310 F.2d 249, 252; Becher v. United States, 2 Cir., 1924, 5 F.2d 45, 49, cert. denied, 1925, 267 U.S. 602, 45 S.Ct. 462, 69 L.Ed. 808; Smith v. United States, 1940, 72 App.D.C. 187, 112 F.2d 217, cert. denied, 311 U.S. 663, 61 S.Ct. 20, 85 L.Ed. 425.

■ While Van Allen occasionally threw a few shafts in the direction of Kelly and Hagen, we think the trial judge handled the matter properly and that his admonition to Van Allen taken with what was said in the main charge, as above described, makes it quite clear that Kelly and Hagen suffered no prejudice. For example, when prodded during cross-examination to give a "Yes or No" answer, Van Allen replied:

"A. Oh, I can answer plenty of questions Yes and No. Wait until Mr. Kelly and Mr. Hagen get on the stand. Let them answer Yes or No.

"The Court: Never mind that, now. Please answer the question. No comment."

After refusing counsel's request that he "castigate" Van Allen, the trial judge took a recess and quietly but firmly told Van Allen in the robing room and out of the presence of the jury that he must stop this sort of thing, explaining his reasons, and Van Allen did stop.

We find no basis here for granting the motion by Kelly and Hagen for a mistrial. There was no error and no prejudice. See Peel v. United States, 5 Cir., 1963, 316 F.2d 907, 912, cert. denied sub nom. Crane v. United States, 375 U.S. 896, 84 S.Ct. 174, 11 L.Ed.2d 125; United States v. Parness, 3 Cir., 1964, 331 F.2d 703, cert. denied, 377 U.S. 993, 84 S.Ct. 1919, 12 L.Ed.2d 1045. This type of incident is more or less to be expected in a long trial and the way Judge Cashin handled it was entirely proper. To have admonished Van Allen in the presence of the jury would perhaps have given the jury the impression that this trivial incident was a matter of some consequence.

### C

■■ Before trial Kelly and Hagen made a motion to take the deposition of Adam Miles of Stahl, Miles & Co., Ltd., and this motion was denied, as Miles was then a fugitive from justice. We shall not take the time to enter into a digression on the subject of the many other factors supporting this exercise of judicial discretion. Suffice it to say that we think the denial of this motion was proper. United States v. Soblen, S.D.N.Y., 1961, 203 F.Supp. 542, 568–569, affirmed, 2 Cir., 1962, 301 F.2d 236, cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810; United States v. Bentvena, 2 Cir., 1963, 319 F.2d 916, 941, cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271. The significance of this ruling here, however, is that, when certain documents were produced from the files of Stahl, Miles & Co., Ltd., the admission of these documents into evidence, coupled with the denial of the motion to take the deposition of Miles, is said to violate the rights of Kelly and Hagen to compulsory process and "to be confronted with the witnesses" against them, as required by the Sixth Amendment and also to deprive them of a fair trial and to deny them due process of law under the Fifth Amendment. A somewhat similar argument is made with reference to doc-

uments produced during the testimony of Hagenbach, as a similar motion to take the deposition of Hagenbach before trial had been denied. No authorities are cited in support of the claims of violations of the Fifth and Sixth Amendments by the use of these documents in the absence of Miles and after the denial of the motion to take Hagenbach's deposition. We see no merit in these arguments. See also United States v. Rosenblum, 2 Cir., 1964, 339 F.2d 473. It would indeed be a strange state of affairs if a defendant by becoming a fugitive from justice could succeed in excluding documentary evidence against his co-conspirators unless the prosecutor consented to the taking of his deposition abroad. See also United States v. Soblen, supra, S.D.N.Y., 1961, 203 F.Supp. 542, 568, affirmed, 2 Cir., 1962, 301 F.2d 236, cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810. We see no relationship between the denial of the taking of the depositions of Miles and Hagenbach and the use of the documents as evidence, in view of the fact that the necessary foundation was laid to make the documents admissible. They were, of course, highly relevant to the issues on trial.

### D

■■■ Scraping the bottom of the barrel Kelly and Hagen came up with another claim of violation of constitutional rights to the effect that the rule admitting documentary evidence as past recollection recorded should be overruled. The argument, based upon the dissenting opinion in the rather extreme situation presented by People v. Hobson, 1963, 369 Mich. 189, 119 N.W.2d 581, runs something like this: a document received in evidence as past recollection recorded is received when the witness has no present recollection of the facts, therefore the net result is that the accused is deprived of the opportunity to cross-examine and hence his right to confrontation is impugned. The doctrine of past recollection recorded has long been favored by the federal and practically all the state courts that have had occasion to decide the question. See, e. g., United States v. Riccardi, 3 Cir., 1949, 174 F.2d 883, cert. denied, 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746; Papalia v. United States, 5 Cir., 1957, 243 F.2d 437; Rumely v. United States, 2 Cir., 1923, 293 F. 532, 552, cert. denied, 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520; Commonwealth v. Butts, 1964, 204 Pa.Super. 302, 204 A.2d 481; Jordan v. People, 1962, 151 Colo. 133, 376 P.2d 699, cert. denied, 1963, 373 U.S. 944, 83 S.Ct. 1553, 10 L.Ed.2d 699; People v. Gardner, 1957, 147 Cal. App.2d 530, 305 P.2d 614; State v. Bradley, 1950, 361 Mo. 267, 234 S.W.2d 556; People v. Weinberger, 1925, 239 N.Y. 307, 146 N.E. 434. See generally 3 Wigmore, Evidence, Sections 734–55 (3d ed. 1940); McCormick, Evidence 590–95 (1954); Annots., 82 A.L.R.2d 473 (1962), 125 A.L.R. 19 (1940). As Professor Wigmore states: "It cannot be doubted that the use of a recorded past recollection (under the conditions to be examined later) now occupies a firm and unassailable place in our practice and doctrine." 3 Wigmore, Section 736 at 70. We see no reason to overrule these authorities or to question the soundness of their reasoning and the policy that underlies them. The application of this doctrine, like the principles relating to dying declarations, prior testimony of deceased witnesses, and indeed virtually all the exceptions to the hearsay rule, does not involve any deprivation of the right of confrontation as the Sixth Amendment has been interpreted and construed. United States v. Leathers, 2 Cir., 1943, 135 F.2d 507, 511; People v. Hobson, supra, 1963, 369 Mich. 189, 119 N.W.2d 581; Kinsey v. State, 1937, 49 Ariz. 201, 65 P.2d 1141, 125 A.L.R. 3; Hall v. State, 1960, 223 Md. 158, 162 A.2d 751; United States v. Rosenblum, 2 Cir., 1964, 339 F.2d 473; Pointer v. State of Texas, 1965, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923; Kay v. United States, 4 Cir., 1958, 255 F.2d 476, 480–481, cert. denied, 358 U.S. 825, 79 S.Ct. 42, 3 L.Ed.2d 65; Matthews v. United States, 5 Cir., 1954, 217 F.2d 409, 418; United States v. Johns-Manville Corp., E.D.Pa., 1964, 231 F.Supp. 690, 694–

696; 5 Wigmore, Evidence, Sections 1395, 1397; McCormick, Evidence, Section 231 at 483; Note, 41 U.Det.L.J. 118 (1963).

The question arose in this case in connection with the memorandum made by the witness Robert Swanson about his conference with Kelly on November 3, 1954. At that time Swanson was associated with the First National City Bank of New York and the conference concerned the appointment of that bank as a co-transfer agent of Gulf Coast Leaseholds stock.

We would not have mentioned a contention so lacking in merit except for the fact that we wish to make it perfectly plain that no argument, especially one addressed to an alleged violation of constitutional rights, has been overlooked or not given full consideration.

## IX

### Objections to Various Documents Offered by the Prosecutor Were Properly Overruled

Kelly and Hagen assert that seventeen documents offered into evidence by the Government were improperly received. Our study of the record convinces us that each of these seventeen documents was either plainly admissible or admitted for such limited purposes that there was no prejudice to Kelly or Hagen.

### A

Many of the challenged documents were direct links in the Government's chain of proof demonstrating that Kelly and Hagen owned the secret Swiss trust Universal Finance Company and that Universal Finance was the medium through which Kelly and Hagen collected their ten per cent kickback from Van Allen. The culmination of this line of proof was a "private and confidential" letter by Hagen to Kelly dated December 24, 1956. This letter was part of Government Exhibit 990. At the tail-end of our Review of the Evidence, we mentioned the fact that in December 1956 Stahl, Miles & Co. foreclosed on Van Allen's Gulf Coast debentures and these

debentures were brought in by Hagen and Kelly. Van Allen was mightily distressed by this development and the letter from Hagen reflects his reaction: "I, by the same token, can certainly not understand the Corpus Christi situation and the Van Allen one from a long time back. Why he would think I was the villain in connection with the GCL bonds, I do not know; when he has certainly taken off with some 73,000 shares of *our* Corpus Christi * * *" (Emphasis added.) The Government's documentary proof sought to establish that when Hagen referred to 73,000 shares of "our" Corpus Christi, he was talking about 73,000 shares owned by Universal Finance and transferred on July 26, 1956 by Universal Finance to Van Allen's Brandel Trust.

The sequence begins with Government Exhibit 446(a), a letter dated April 13, 1955 by the Swiss lawyer Keller-Staub to the Houston brokerage firm of Porter, Stacy & Co., opening a trading account for Universal Finance Company. The letter authorizes Porter, Stacy to take instructions for purchases and sales of securities for the account from either Roy Kelly or Cecil Hagen. The next step is Government Exhibit 446(d), another letter written by Keller-Staub dated May 2, 1955, requesting Porter, Stacy to close the Universal account. Government Exhibit 446(e) is a letter over Kelly's signature dated May 3, 1955, instructing Porter, Stacy to forward some shares of Gulf Coast Leaseholds which Hagen and Kelly were "borrowing" from the Universal Finance account. On May 10, 1955, Keller-Staub, on behalf of Universal Finance wrote Government Exhibit 446(i) to Porter, Stacy cancelling the direction of May 2, 1955 to close the account. This letter begins: "On special desire of our advisor and agent, Mr. Roy B. Kelly, we sent you today the following cable: BEG NOT TO CLOSE OUR ACCOUNTS AND DEPOSITS WITH YOU BUT CONTINUE TO MAINTAIN BOTH."

On June 21, 1955, Kelly wrote to Porter, Stacy and enclosed for the Universal account "certificate No. 18090 represent-

ing seventy-three thousand shares of Corpus Christi Refining Company." Subsequently, the Universal account at Porter, Stacy was closed and a new one opened at Ray Johnson & Co., another Houston brokerage firm. Government Exhibit 446(uu), is a letter from Porter, Stacy to Ray Johnson & Co. dated August 22, 1955. This letter begins: "As requested by Mr. Cecil V. Hagen, we hand you herewith CORPUS CHRISTI REFINING COMPANY certificate #18090 for 73,000 shares." The certificate next turns up on February 3, 1956 according to a letter written by Hagen's secretary, which is Government Exhibit 433. This letter was addressed to De Pontet & Co., one of the brokerage houses controlled by Van Allen's friend Charles Stahl. Enclosed with the letter is "Certificate No. 18090 * * * in the amount of seventy-three thousand (73,000) shares of stock of the Corpus Christi Refining Company." The letter continues: "Mr. Hagen has instructed that these shares are to be sent to you for the account of Stahl, Miles and Company, Ltd. [which] will carry this stock for the account of Universal Financing Company."

Apparently some complications at the brokerage houses impeded the speedy execution of Hagen's instructions. On February 24, 1956, Hagen's secretary wrote another letter, Government Exhibit 434, to DePontet & Co., which requested the firm to "correct the handling" of the certificate so that it would be held through Stahl, Miles for Universal Finance. The reply, Government Exhibit 434(a), signed by Adam Miles and dated March 5, 1956, is addressed to Hagen and states: "Please note that in accordance with your request the 73,000 shares of Corpus Christie [sic], all in one certificate No. 18090 will be held for the account of Universal Financing Co."

As we have mentioned, during July 1956 the Universal account at Stahl, Miles transferred 73,000 shares of Corpus Christi to Van Allen's Brandel Trust. At this point, however, Van Allen was considerably in debt to Stahl, Miles and the firm was unwilling to extend Van Allen further credit to cover the purchase price of these shares, $146,000. It was accordingly decided that until Van Allen's debts to Stahl, Miles were paid off, Universal Finance would not be able to use the $146,000. By December 24, 1956, Van Allen had still not satisfied his debt, and the letter from Hagen to Kelly about Van Allen taking off with "our Corpus Christi" and which we have previously described was written. The final document in this series is Government Exhibit 442, a letter over Miles' signature dated February 15, 1957. This letter is addressed to Kelly and recapitulates the details of the Brandel-Universal transaction in Corpus Christi.

The admissibility of several of these documents is not questioned here for obvious reasons. These unchallenged documents are: Hagen's letter to Kelly about "our Corpus Christi"; Kelly's letter of June 21, 1955 transmitting the 73,000 shares of Corpus Christi to Porter, Stacy & Co.; and Government Exhibits 433 and 434, the letters concerning these shares written by Hagen's secretary to DePontet & Co. during February 1956.

Kelly and Hagen argue, however, that the reception into evidence of the other documents above described constitutes reversible error as each of these documents was inadmissible under the hearsay rule. These challenged documents include five letters about the Universal Finance account at Porter, Stacy & Co., Government Exhibits 446(a), 446(d), 446(e), 446(i) and 446(uu), and the two letters by Adam Miles, Government Exhibits 434 (a) and 442, concerning the Universal account at Stahl, Miles & Co.

The testimony offered in connection with these challenged exhibits, as well as the documents themselves, makes it quite clear that each was "made in [the] regular course of any business." 28 U. S.C. § 1732(a). Accordingly, each of these documents, though hearsay, was plainly admissible under the standard exception to the hearsay rule permitting the introduction of business records into evidence. The hearsay exception for

business records has recently been discussed in such cases as United States v. Re, 2 Cir., 1964, 336 F.2d 306, 311–314, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177, and LeRoy v. Sabena Belgian World Airlines, 2 Cir., 1965, 344 F.2d 266, 271–274, 279. See also All Nations Trading Co. v. United States, 5 Cir., 1964, 338 F.2d 501; Korte v. New York, N. H. & H. R. R., 2 Cir., 1951, 191 F.2d 86, 88–91, cert. denied, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652; La Porte v. United States, 9 Cir., 1962, 300 F.2d 878; United States v. Olivo, 3 Cir., 1960, 278 F.2d 415. See generally 5 Wigmore, Evidence, Sections 1517–33 (3d ed. 1940); McCormick, Evidence, Sections 281–89 (1954). Accordingly, without going into a detailed discussion of the extent to which these various letters were declarations of co-conspirators in furtherance of the conspiracy, we consider it sufficient to say that the Government sustained its burden of demonstrating the applicability of the business records exception to each of the documents now claimed to have been improperly received as evidence in the case, namely, Government Exhibits 434(a), 442, 446 (a), 446(d), 446(e), 446(i), 446(uu).

## B

Having thus established that the secret Swiss trust Universal Finance Company was owned and controlled by Hagen and Kelly, the Government proceeded to demonstrate that substantial sums of money were paid to Universal Finance by Van Allen. Van Allen's testimony concerning the kickbacks to Hagen and Kelly was rather detailed, and during the course of this testimony the Government introduced numerous letters written by Van Allen to Keller-Staub, the Swiss attorney, which directed Keller-Staub to make various payments to Universal Finance and execute certain other transactions on Van Allen's behalf. Thus, Government Exhibit 828, dated March 26, 1955, contains Van Allen's instruction to Keller-Staub to transfer $80,000 to Universal Finance; Government Exhibit 823, dated May 12, 1955, directs Keller-Staub to pay Universal Finance $10,000 and Gulf Coast Leaseholds $90,-000; and Government Exhibit 826, dated June 27, 1955, directs the payment of $5,000 to Universal Finance. Each of these letters instructed Keller-Staub to take the necessary funds from Sun Investment, Van Allen's own secret Swiss trust.

Though all of this evidence was received without objection by the defense, counsel for Kelly and Hagen protested strongly and repeatedly to the admission into evidence of Government Exhibit 773. This three-page exhibit is an unsigned copy of a letter to Van Allen dated September 13, 1955. The first two pages consist of a statement of the payments and receipts of Sun Investment. The third page is as follows:

"I thank you for your information about CORPUS CHRISTIE [sic] REFINING CORPORATION. Unhappily, I am rather illiquid and must therefore discuss this matter with my wife.

"With kindest regards

"Yours very sincerely,".

The grounds of objection asserted at the trial by counsel for Kelly and Hagen were that this document was hearsay, that the Government failed to lay a proper foundation for its admission into evidence and that the best evidence rule barred its admission into evidence. During the oral argument of this appeal counsel abandoned the argument premised on the best evidence rule in light of the authority of United States v. Ross, 2 Cir., 1963, 321 F.2d 61, 69–70, cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123.

With respect to the claim of Kelly and Hagen that there was no proof of the authenticity of Government Exhibit 773 and hence no proper foundation laid for its admission into evidence, Van Allen testified that during the Fall of 1962, after he had decided to plead guilty, he authorized his attorney to write to Keller-Staub and request Keller-Staub to deliver all of his relevant documents to the United States so that the

Government could examine them. According to Van Allen's testimony, Government Exhibit 773 was one of the numerous documents sent over by Keller-Staub. Van Allen also testified that he had received the original of Government Exhibit 773 in September 1955 but had made a diligent search for it without success. Moreover, many of the entries in Government Exhibit 773 were corroborated by other documents, such as Government Exhibits 823, 826 and 828 above referred to. We conclude, accordingly, that the prosecution made a sufficient, though entirely circumstantial, showing that Government Exhibit 773 was authentic. See La Porte v. United States, 9 Cir., 1962, 300 F.2d 878; United States v. Olivo, 3 Cir., 1960, 278 F.2d 415; United States v. Johns-Manville Corp., E.D.Pa., 1964, 231 F.Supp. 690, 693–694. See generally McCormick, Evidence, Sections 185–94 (1954). We note, in passing, that counsel for Kelly and Hagen were given more than ample opportunity to argue to the jury that Government Exhibit 773 was a spurious Van Allen creation. See Esco Corp. v. United States, 9 Cir., 1965, 340 F.2d 1000, 1008–1014.

■ Finally, we turn to the contention that Government Exhibit 773 was inadmissible hearsay. We considered the problem of the applicability of the business records exception to the unorthodox documents made and used by members of a stock fraud conspiracy in United States v. Re, supra, 2 Cir., 1964, 336 F.2d 306, 313, cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177, and we concluded: "The fact that the records were not maintained in the most business like or efficient way is likewise immaterial on the threshold issue of admissibility." Van Allen's testimony to the effect that he frequently received similar reports from Keller-Staub and relied upon them, together with the other circumstances surrounding the execution and the contents of Government Exhibit 773, rendered it admissible as a business record.

### C

Kelly and Hagen objected to several additional documents. We have carefully considered their claims of error and find no merit in any of them. As the contents of many of these documents are rather complicated and confusing and involve matters collateral to the basic issues in this case, we shall not burden this already lengthy opinion with further discussion of the admissibility of these documents.

### X

### The Cross-examination of the Government Witness Shreve

■ On January 11, 1955 Kelly and a friend of his, William Light, pursuant to an appointment made with Van Allen's aid, met in Washington with Edward T. Tait of the SEC, who referred them to Charles E. Shreve, an attorney and later Executive Assistant Director of the Division of Corporation Finance, who had been with the SEC since 1935. They said they had a problem and this turned out to be the unregistered shares of Gulf Coast Leaseholds that Van Allen with the help of Kelly and Hagen had been selling. Shreve's testimony concerning the conversation on that day was, as stated in Kelly's brief, to the effect that he told Kelly and Light that an exemption was not available and that they said "they would refrain from delivering any more stock under the contract until registration had been achieved, and that they expected the Swiss group to pay for the registration." Of equal significance, however, was the series of false statements and omissions made by Kelly concerning facts relevant to the subject of exemption. The jury might well have found the whole visit to have been an ingenious device thought up by Kelly to cover his tracks.

In any event, on cross-examination counsel for Kelly produced certain SEC releases and one or more books written by authorities on the securities laws and SEC practices and he began to ask Shreve whether or not he agreed with certain statements in the releases or the books. Objections to these questions were sustained.

We are told by counsel that, although Shreve had given no expert or opinion evidence on his direct examination, still his credibility was in issue and, if counsel could get Shreve to agree with the statements in the releases or books, counsel might lead him up to a situation where it might appear to the jury that it was unlikely he advised Kelly that an exemption was not available.

It is possible that an extensive cross-examination about various SEC rulings on exemptions and the views of text writers might have helped Kelly's claim of good faith. It is much more probable, we think, that the result of such cross-examination would have been confusion. One effect of such confusion might well have been to divert the attention of the jury from the mass of false statements and omissions by Kelly, which we have described in our Review of the Evidence.

■ On such questions of cross-examination into essentially collateral matters the trial judge is given a wide discretion. Alford v. United States, 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 333, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; United States v. Cardillo, 2 Cir., 1963, 316 F.2d 606, 610–611, cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55; United States v. Rich, 2 Cir., 1959, 262 F.2d 415, 418–419; United States v. Ruehrup, 7 Cir., 1964, 333 F.2d 641, 645–646, cert. denied, 379 U.S. 903, 85 S.Ct. 194, 13 L.Ed.2d 177; Lyda v. United States, 9 Cir., 1963, 321 F.2d 788, 793; McCormick, Evidence, Section 29 (1954). While in this instance it would not have been error to allow the questions that were objected to, even though Shreve was not testifying as an expert witness, it was certainly not an abuse of judicial discretion to refuse. Reilly v. Pinkus, 1949, 338 U.S. 269, 275–276, 70 S.Ct. 110, 94 L.Ed. 63; United States v. Owens, 2 Cir., 1959, 263 F.2d 720; Ruth v. Fenchel, 1956, 21 N.J. 171, 121 A.2d 373, 60 A.L.R.2d 71 (Brennan, J.); 6 Wigmore, Evidence, Section 1700 at 18–22;

McCormick, Evidence, Section 296. See generally Annot., 60 A.L.R.2d 77 (1958).

## XI
### It Was Not Error to Send GX990 to the Jury During Its Deliberations

■ In the sub-division of this opinion relating to the admissibility of certain documents offered by the prosecutor and objected to by counsel for Kelly and Hagen, we described the relationship between the several letters relevant to the issue of the ownership of Universal Finance by Kelly and Hagen and the kickback paid to them via Universal Finance. One of these letters, part of Government Exhibit 990, is a letter of December 24, 1956 from Hagen to Kelly containing the statement, "Why he [Van Allen] would think that I was the villain in connection with the GCL bonds, I do not know; when he has certainly taken off with some 73,000 shares of our Corpus Christi * * *" This is one of the letters to which no objection was made.

After a few hours of deliberations the jury sent in a note to the trial judge asking for some exhibits. The fourth item on the list was "Letter written by Mr. Hargen to Mr. Kelly about our investment Universal."

After ascertaining from the jury the information that the reference was meant to be to Mr. Hagen, there was a colloquy at the side bar covering several matters relating to the exhibits the jury had requested. The trial judge indicated he would send in the letter above described. Counsel for Kelly and Hagen objected on the ground that the letter made no specific reference to Universal Finance. We agree with the opinion of the trial judge that this letter was the one the jury wished to obtain. As noted in the Government brief this letter "is the only letter from Hagen to Kelly that was in evidence." We find no error here.

## XII
### The Refusal to Excuse Juror No. 3 Was Proper

■ The length of the trial was a source of much discomfort to all con-

cerned, especially to the jurors, who had been told at the outset that the case might go on for two or three months. There were days off for an occasional funeral and to allow a juror to consult his physician. Shuck's illness, already referred to, caused interruptions of the trial lasting many days. There were numerous delays caused by discussions in the robing room which kept the jurors waiting around for the daily proceedings to commence. Finally, on April 29, 1963 Juror No. 9, who had complained of the delays and the hardships they had caused him personally, stated that he thought "the defense is doing it intentionally with an ulterior motive." So he was excused, after having told the trial judge that he had not mentioned the subject of his feelings to any of the other jurors; and an alternate took his place. There was also some discussion of a news article in the *New York Times* of Sunday, April 7, 1963 which mentioned the possibility of a strategy by defense counsel "of consuming as much time as possible."

On May 6, 1963 this subject was again pursued and the interrogation of Juror No. 3 elicited replies that demonstrated, according to counsel for Kelly and Hagen, a state of mind on the part of Juror No. 3 of such a character as to disqualify him from further service on the jury in this case. The trial judge retained Juror No. 3 and denied the motion to remove him and to substitute an alternate. We agree with these rulings. Indeed, the record is so clear that we think the trial judge had no alternative other than to dispose of the matter as he did.

The substance of the statement by Juror No. 3 is that he had read the article in the *New York Times*, that he was of the opinion that it would not influence his verdict "with regard to the defense or the prosecution"; but that he did have some feeling "about the whole case." He explained that while he had no animosity against any of the parties, "I may feel a slight animosity toward the whole proceedings." It would be strange indeed if he did not.

In the colloquy between the trial judge and Juror No. 3 the latter showed not the slightest prejudice against the appellants, or any of them. Nor do we discern "the tip of an iceberg of prejudice" in the remark of Juror No. 3 to the effect that he spoke only as of the day of his interrogation, and "Being human, I don't know how I am going to feel about it a month from today or whenever the case ends."

The rule governing the disposition of such applications is an old one that may be traced back to the treason trial of Aaron Burr in which Chief Justice John Marshall stated, 1 Burr's Trial at 416 (1807):

> "light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitutes no sufficient objection to a juror; but * * * those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him."

See also Irvin v. Dowd, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751; Holt v. United States, 1910, 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021; Spies v. People of State of Illinois, 1887, 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80. It is true that this Court also has a function to perform, bearing in mind the fact that the trial judge had the benefit of seeing and hearing Juror No. 3 in person. See, e. g., Rideau v. State of Louisiana, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; United States ex rel. Bloeth v. Denno, 2 Cir., 1963, 313 F.2d 364, cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143. But the governing rule with respect to questions concerning juror prejudice is: "The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest." Reynolds v. United States, 1878, 98 U.S. 145, 156, 25 L.Ed. 244. See also Irvin v. Dowd, supra,

1961, 366 U.S. 717, 723–724, 81 S.Ct. 1639. Reviewing the record before us, and taking the applicable law into consideration, we find no basis for disagreement with the rulings below.

## XIII
### Omnibus Discussion of Miscellaneous Other Claims of Error

 We find no merit in any of the other multifarious claims of error made in the Kelly and Hagen briefs. Many of these are based upon procedures and practices that are not followed in the Southern District of New York, or in this Circuit. For example, counsel for Kelly and Hagen requested that the prosecutor be required to sum up before counsel for the defense and that his reply be restricted to new matter not the subject of his summation in chief. They also repeatedly requested that they be furnished with a copy of the entire charge to the jury both for the purpose of preparing their summations and also to facilitate the noting of exceptions to the portions of the charge they might find objectionable. Much time was consumed by their demands that the trial judge explain his rulings on the admissibility of evidence, documentary and otherwise. Other claims of error have to do with a miscellany of procedural minutiae concerning the handling of pre-trial motions and other matters. In connection with the alleged "promise" of the trial judge not to mention the evidence or the facts of the case in his charge, it is alleged as prejudicial error that, with respect to various particular phases of the case referred to in the charge, the trial judge "broke" this "promise" by giving the brief description of the factual background that was necessary to make his instructions intelligible. There are many more of such claims of error, some of them relating to parts of the charge. Suffice it to say that each and every one of the claims of error made on behalf of Kelly and Hagen has received our close attention. We find no prejudicial error against Kelly and Hagen, or either of them, in this record.

## XIV
### The Substantive Counts

 We have carefully considered the numerous contentions made by Kelly and Hagen with respect to their convictions on the three substantive registration counts, and have found no merit in any of them. Accordingly, we affirm in all respects the convictions of Kelly and Hagen.

 Shuck, however, stands in an entirely different position. As we have already pointed out, the accumulation of evidence of wrongdoing by Kelly and Hagen and especially the admission into evidence of substantial portions of the post-conspiracy testimony of Kelly and Hagen before the SEC and the Attorney General of the State of New York and Kelly's letter, Government Exhibit 991, and the failure to sever as to Shuck, were so prejudicial to him on all counts as to require the reversal of the judgment of conviction against Shuck on the substantive fraud counts as well as on the conspiracy count. See United States v. Bentvena, 2 Cir., 1963, 319 F.2d 916, 955–956, cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271. Most of the other various claims of error advanced by counsel for Shuck relate to incidents that are not likely to arise on the new trial of the case against Shuck and we do not think it necessary to discuss them. The sufficiency of the evidence against Shuck on all the counts on which the jury found him guilty will be discussed briefly at the end of this opinion.

## XV
### The Challenge to the Method of Selecting Jurors Was Properly Overruled

 As if this case was not already sufficiently complex, the defense launched a full-scale attack upon the methods employed in the Southern District of New York to select members of grand and petit juries. The procedures utilized by the jury clerk of this district and his assistants have been carefully set forth in the opinion below, 1962, 208 F.Supp.

331, which followed hearings consuming four court days, and in Judge Bryan's opinion in United States v. Greenberg, S.D.N.Y., 1961, 200 F.Supp. 382, which we heartily endorsed in United States v. Agueci, 2 Cir., 1962, 310 F.2d 817, 833–834, cert. denied sub nom. Guippone v. United States, 1963, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11. And most of what appellants have to say on this subject is foreclosed by decisions dating back to United States v. Foster, D.C. 1949, 83 F.Supp. 197, affirmed sub nom. United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 216–224, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. See also United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, 378–389, cert. denied, 1955, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713; United States v. Agueci, supra, 2 Cir., 1962, 310 F.2d 817, 833–834, cert. denied sub nom. Guippone v. United States, 1963, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11. Accordingly, we find it unnecessary to engage in any prolonged discussion of why we consider appellants' contentions patently without merit. We trust that sooner or later it will be perceived that the principles of *stare decisis* are as applicable to this branch of the law as to any other. Kovens v. United States, 5 Cir., 1964, 338 F.2d 611, 615, cert. denied, 1965, 380 U.S. 976, 85 S.Ct. 1338, 14 L.Ed.2d 271; Katz v. United States, 1 Cir., 1963, 321 F.2d 7, 8.

 The first contention that the use of voter registration lists as the primary source of names of prospective jurors is improper under the Civil Rights Act of 1957,[11] runs head on into the contrary authority of United States v. Greenberg, supra, 200 F.Supp. 382; United States v. Agueci, supra, 310 F.2d 817, 833–834; Gorin v. United States, 1 Cir., 1963, 313 F.2d 641, 643–644, cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; Chance v. United States, 5 Cir., 1963, 322 F.2d 201, 202–205, rehearing denied, 5 Cir., 1964, 331 F.2d 473, cert. denied, 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34; United States v. Kenner, S.D.N.Y., 1965, 36 F.R.D. 391. Suffice it to say that these cases make it palpably clear that the persons who are not registered to vote do not constitute "any identifiable group in the community which may be the subject of prejudice." Swain v. State of Alabama, 1965, 380 U.S. 202, 205, 85 S.Ct. 824, 13 L.Ed.2d 759.

 The next claim is that the Civil Rights Act of 1957 precludes the practice whereby the jury clerk and his assistants excuse the large number of persons who have received notices to appear as prospective jurors but who claim and demonstrate that such service would impose undue financial hardships. We find nothing in the language, purpose or legislative history of the Act, discussed in United States v. Greenberg, supra, 200 F.Supp. 382 at 393–395, which purports to compel such persons to fulfill their civic responsibility of jury service irrespective of any hardships, financial

---

11. 71 Stat. 634. As is well known, the Civil Rights Act of 1957 was the first such act to be passed by the Congress since the days of Reconstruction. The 1957 Act established the United States Commission on Civil Rights, provided for an additional Assistant Attorney General of the United States and sought to guarantee equality in the exercise of the right to vote. The final part of the Act provides for trial by jury in certain cases of contempt arising out of this Act, and amended 28 U.S.C. § 1861 which prescribes the qualifications of federal jurors. That Section now reads:

"Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

(2) He is unable to read, write, speak, and understand the English language.

(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

Prior law had been to the effect that if a person was incompetent under State law to serve as a juror in the courts of the State, he was likewise incompetent to serve as a Federal juror.

or otherwise, that might accrue from such service. See also United States v. Woodner, 2 Cir., 1963, 317 F.2d 649, 651, cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144; United States v. Henderson, 7 Cir., 1962, 298 F.2d 522, cert. denied, 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280. Nor do we find anything which undermines the proposition that, as a practical matter and subject to proper supervision by the District Courts, jury officials must be vested with a large measure of discretion to determine whether a particular individual should or should not be excused from jury service. See United States v. Flynn, supra, 216 F.2d at 386–388; United States v. Dennis, supra, 183 F.2d at 220–221; United States v. Foster, supra, 83 F.Supp. at 200; United States v. Greenberg, supra, 200 F.Supp. at 388–389.

▮▮ Finally, there is a claim that it was improper for the jury clerk and his assistants to send notices to appear as prospective jurors only to residents of New York, Bronx and Westchester Counties instead of to residents of all eleven counties which comprise the Southern District, and that it was improper to restrict the mailing of these notices to the twelve cities and towns of Westchester County closest to New York City. The first claim was rejected in United States v. Gottfried, 2 Cir., 1948, 165 F.2d 360, 363–365, cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139, in which Learned Hand took judicial notice that in 1940, 3,850,000 of the 4,400,000 residents of the Southern District lived in New York, Bronx and Westchester Coun-

ties, where notices were sent. We take judicial notice of the fact that in 1960 the population of New York, Bronx and Westchester Counties was 3,930,000, while the population of the eight remaining counties in the Southern District was 770,000. We conclude, accordingly, that Gottfried is still controlling. See also United States v. Titus, 2 Cir., 1954, 210 F.2d 210, 212–213.

▮ The claim that it was improper to send jury notices only to the twelve cities and towns in Westchester County closest to New York City, the situs of the United States Courthouse for the Southern District of New York, 28 U.S.C. § 112(b), is equally groundless. As Judge Bryan pointed out in United States v. Greenberg, supra, 200 F.Supp. at 384, about 80% of the population of Westchester County lives in these twelve cities and towns. In contending that there is no power to limit the mailing of jury notices to areas reasonably close to the Courthouse, appellants apparently overlook the clear language of 28 U.S.C. § 1865(a).[12] See United States v. Titus, supra, 210 F.2d 210, 212–213; Katz v. United States, 1 Cir., 1963, 321 F.2d 7; United States v. Kenner, S.D.N.Y., 1965, 36 F.R.D. 391.

## XVI
### Conclusion

The judgments of conviction against Kelly and Hagen on Counts 1, 57, 60 and 61 are in all respects affirmed.

The judgment of conviction against Shuck on Counts 1, 93, 105 and 107 is

---

12. Which provides:
"Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service."
The claim that the jury officials have usurped powers vested in the District Courts is belied by the record as well as history. See United States v. Gottfried, supra, 165 F.2d 360; United States v. Flynn, supra, 216 F.2d at 386–388. In-

deed, the very frequency with which defense counsel raise comprehensive objections to the method of selecting jurors and the frequency with which the courts are compelled to pass upon these consistently groundless challenges, renders frivolous the contentions that the jury officials have been subjected to inadequate judicial supervision or that the judges are unaware of what these officials have been doing. See also the opinion below, 208 F.Supp. 331, 337; United States v. Steel, S.D.N.Y., 1965, 238 F.Supp. 578.

reversed and the case against him is remanded for a new trial.

We have already said that there was evidence to support a finding that Van Allen and Shuck, and perhaps others conspired in a fraudulent scheme to undertake a pressure campaign or "boiler room" operation to induce individual investors to buy Gulf Coast stock at inflated prices and hold it. Whether or not there was evidence sufficient to connect Shuck with the single, over-all conspiracy is a close question which we do not decide on this appeal. The proofs may be barely sufficient. We think, however, that it is in the interest of substantial justice to leave this question open for decision, if necessary, on the new trial. We entertain this view not only because the new trial, insofar as it relates to the conspiracy charge, may be restricted to the alleged conspiracy involving Shuck, Van Allen and others just referred to, United States v. Russano, 2 Cir., 1958, 257 F.2d 712, 716; see United States v. Dunn, 6 Cir., 1962, 299 F.2d 548, 555; United States v. Ratke, 6 Cir., 1963, 316 F.2d 225; Bryan v. United States, 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335; Yates v. United States, 1957, 354 U.S. 298, 327–334, 77 S.Ct. 1064, 1 L.Ed.2d 1356, 28 U.S.C. § 2106, but also because of the serious and far-reaching implications of a ruling on the alleged single, over-all conspiracy charge with respect to brokers, broker-dealers and others involved in the whole apparatus of the marketing of stocks. See United States v. Crosby, 2 Cir., 1961, 294 F.2d 928, 938–943, cert. denied sub nom. Mittelman v. United States, 1962, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523.

We direct a new trial of the substantive counts against Shuck because we do not agree with the argument advanced on Shuck's behalf to the effect that the evidence is insufficient to support the allegations of Counts 93, 105 and 107 of the indictment. The argument must rest principally upon the contention that Teller's testimony should have been eliminated in its entirety because, as it is said, he conceded or admitted that he was unworthy of belief. Doubtless he is an unsavory character. It may well be that he will perjure himself and has perjured himself from time to time when he thought it was to his advantage to do so. But his credibility was for the jury. United States v. Dardi, 2 Cir., 1964, 330 F.2d 316, 325, cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; United States v. Robbins, 2 Cir., 1965, 340 F.2d 684, 687; United States v. Mims, 7 Cir., 1965, 340 F.2d 851, cert. denied, 85 S.Ct. 1535; Proffit v. United States, 9 Cir., 1963, 316 F.2d 705. An appellate court cannot disregard his testimony.

The motion to strike portions of the Government brief, submitted during the oral argument of the case by counsel for Kelly and Hagen, is denied.

Affirmed as to Kelly and Hagen. Reversed and remanded for a new trial as to Shuck.

MOORE, Circuit Judge (concurring):

I concur not only with the result reached but also with the fundamental reasons (with the exceptions herein set forth) so ably expressed by my Brother Medina. Although the proof is convincing that Shuck was not a participant in the financial gyrations which Kelly, Hagen and Van Allen indulged in whereby the stock was made available for their fraudulent purposes, it is the law, as I understand it, that it is not necessary that every defendant-conspirator be in the conspiracy or know of and be working towards the fulfillment of its purposes during the total period of its existence. Nor is it possible that proof be offered simultaneously against every defendant in long multi-defendant cases. There are bound to be defendants against whom proof of participation is not adduced until the latter days of the trial. A trial judge until the end of the trial has no way of knowing the nature and extent of the proof which may be offered to tie one or more defendants into the conspiracy and upon which proof the jury may have to decide the character of the conspiracy. Therefore, with the conclu-

sion that during the trial "It was an abuse of judicial discretion to deny the motion for a severance, at that time [when the administrative agency testimony of Kelly and Hagen and the Kelly letter were received]," I must differ strongly. It may well be, as says my Brother, that "it is clear to us that the motion then made by counsel for Shuck for a severance should have been granted" but what is "clear to us" from our vantage point of contemplative review of the entire record could not possibly have been clear to the trial judge who at the time when the ruling was required could not have known what the record would be. To me, the admission of the Kelly-Hagen SEC testimony was error and sufficient for reversal. I would not attribute error to the denial of the motion for a severance.

Nor would I characterize as a mistake the reading of the long indictment. Probably the jury benefited little from its reading but I would hold this procedure to be within the discretion of the trial judge.

As to the acceptance of pleas of guilty from defendants during the trial, the manner of handling the plea and the method of informing the jury thereof will depend upon many circumstances which can best be appraised by the trial judge. I, therefore, disagree with the comments in the opinion on this subject.

The trial court refrained from summarizing the evidence in his charge. Counsel for the respective parties requested that the court so refrain. Their judgment as to the benefits to be gained thereby for their clients must be presumed to have been wisely and properly exercised. In a trial of such length, it would have been utterly impossible for a judge to have summarized all the evidence to the satisfaction of all. Counsel undoubtedly felt that, rather than have the judge's views of the facts, they preferred the jury's recollection. I, therefore, cannot subscribe to the statement that "The trial judge should not have agreed to the request by counsel that this marshalling of the evidence be omitted."

Lastly, I hesitate even impliedly to endorse a proposition that it is the function of an appellate court to review the record to ascertain in retrospect what objections this court, if acting as trial counsel, might have made. Counsel were in a position to make such objections to the charge as might have been in the interest of the defendants. They did not do so. The trial judge should have been given the benefit of their objections because a change might well have been made in the charge to meet the objections. The "plain error" doctrine may serve a useful function where the error would be highly prejudicial to a defendant but should be resorted to with caution. In my opinion, such an occasion is not presented here.